[Crim. No. 804.   Second Appellate District, Division One.—January 7, 1922.]

## THE PEOPLE, Respondent, v. OSCAR A. BOWERS, Appellant.

[1] CRIMINAL LAW—MURDER—SUFFICIENCY OF EVIDENCE.—In this prosecution under an indictment charging the defendant and two others with the crime of murder, the evidence sufficiently shows that the defendant was a coparticipant and an accomplice of the person who did the actual killing.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial. Paul J. McCormick, Judge.   Affirmed.

The facts are stated in the opinion of the court.

Davis, Rush & MacDonald, W. W. Hyams and Clyde Burr for Appellant.

U. S. Webb, Attorney-General, Arthur Keetch, Deputy Attorney-General, and R. L. Chamberlain for Respondent.

JAMES, J.—The defendant was convicted of the crime of murder in the first degree.   The verdict of the jury fixed punishment at "imprisonment for life."   The judgment of the court followed in the terms prescribed by the law.   The defendant thereafter appealed from the judgment and from an order made denying his motion for a new trial.

The indictment of the grant jury charged the defendant, together with Maybelle Roe, Edward F. Doane, and Julia Doane, with having on the first day of September, 1920, with malice aforethought, killed and murdered one McCullough

Graydon. The appellant here was separately tried. He complains of the insufficiency of the evidence and of certain alleged errors of law occurring in the course of the trial. In considering the claims of the defendant we will make a general statement of the evidence as the record discloses it, giving prominence to that offered by the prosecution for the reason that we have here nothing to do with the matter of reconciling a conflict, but must uphold the judgment if it appears that substantial evidence was introduced supporting the charge. The affray in which the defendant was engaged occurred at the seaside resort of Venice and was precipitated by a controversy which existed between the deceased and Julia Doane respecting the right to the possession of a dwelling-house. Julia Doane owned this house, and a number of months prior to the date charged in the information had leased the same to the deceased Graydon, who thereafter occupied it with his wife. After they had used the premises for several months, Mrs. Doane, who also lived at Venice, served two notices upon the Graydons, the first being to raise the monthly rental, and the second requiring possession to be given to her after the Graydons had failed to pay the increased rental. The Graydons contended that they were occupying under an oral lease for one year, while Mrs. Doane contended that the tenancy was from month to month. Mrs. Doane proceeded to bring an action against the Graydons for unlawful detainer, and the issue being tried in that suit as to the duration of the lease, judgment was rendered in favor of the lessees, the Graydons. Before this action had terminated, Mrs. Doane had taken possession of her house and had installed a tenant therein. The Graydons having succeeded in the action referred to, in turn brought suit against Mrs. Doane to secure possession of the house. This action progressed to judgment and again the judgment was in favor of the Graydons. A few days after the entry of the latter judgment, Graydon applied for a writ of restitution, which was issued to him, and in company with a deputy sheriff he, together with Mrs. Graydon and the latter's sister, Miss Marshall, proceeded to Venice for the purpose of resuming possession of the Doane house. The deputy sheriff charged with the duty of executing the writ caused the possession of the house to be delivered over by the tenants of Mrs. Doane to the Graydons and, having

56 Cal. App.—6

fully performed his functions in that regard, left the prem- . ises. It appears that prior to the issuance of the writ of restitution, the attorney for Mrs. Doane had prepared and filed a bond on appeal, staying execution of the judgment. The clerk, in issuing the writ of restitution, did not examine the record to ascertain whether such a bond was on file, although he testified that he inquired of whoever it was who received the writ as to whether such a bond had been filed and received a response in the negative. Very shortly after the Graydons had been placed in possession of the house under the writ of restitution, the attorney for Mrs. Doane was notified of the fact and telephoned to appellant Bowers, requesting him to go to Venice and give notice that the bond had been filed. Bowers had been a client of this attorney and it was through him that the Doane business had been brought to that · attorney's office. Bowers went to Venice in an automobile, taking Maybelle Roe with him. Both Bowers and Maybelle Roe, and especially the latter, seem from the evidence to have adopted the Doane-Graydon controversy as personal to themselves. So far as can be learned from any of the evidence, neither Bowers nor Maybelle Roe had any interest whatsoever in the Doane house or any lease made by Mrs. Doane. Bowers and Roe lived in the city of Los Angeles, both being boarders at the home of the latter's mother. On the early occasion, before the first suit brought by Julia Doane against the Graydons, Maybelle Roe accompanied Mrs. Doane to the house where Mrs. Graydon was, where a wordy controversy was had, in which Maybelle Roe took a more prominent part than Mrs. Doane, the owner. It was appellant's statement given at the trial that on the day of the affray he took Maybelle Roe with him because she was not feeling well and needed the fresh air. Subsequent developments showed that for a person in enfeebled health Maybelle Roe was capable of great physical activity, for on the occasion of this second controversy which resulted fatally to Graydon her participation therein was of the more deadly consequence. That she and appellant Bowers acted with mutual intent and like purposes no reasoning mind can doubt upon examination of the record here exhibited, and by that record it is shown plainly enough that had it not been for the presence and acts of Bowers and Maybelle Roe the controversy between the

Doanes and Graydons as to the possession of the house would have been settled in a peaceful way, unaccompanied by the tragedy which occurred. After Bowers and Maybelle Roe arrived at the house, with the Graydons on the inside, they first knocked at the windows and called to Graydon, using profane language. Mrs. Graydon left the place and went to the police station at Venice, which was some distance away, in an endeavor to secure police protection. She was unable to obtain help from that quarter and, being tired, she secured a taxicab to take her back to the house. Before doing this she went to a hardware store and endeavored to procure a revolver, but failed, as such weapons were not found there for sale. Upon her return to the house she persuaded the taxicab driver, who appears not to have known any of the parties, to enter the place with her. This driver was a witness of the events which followed. Before the final affray occurred, however, the Graydons having been orally informed by either the Doanes or Bowers that a bond had been given to stay execution, the sister, Miss Marshall, went in the taxicab to a telephone and telephoned to Los Angeles and ascertained that such a bond had been given. She returned to the house and re-entered the same, together with the taxi driver, and informed the Graydons of the facts. About this time Mrs. Doane arrived at the door and demanded admittance. Mrs. Doane was a woman of about sixty years, of nervous and excitable temperament. She asked to be admitted and was told by Mrs. Graydon that she could come in if she would not let Bowers nor Maybelle Roe, in, to which Mrs. Doane finally agreed. After Mrs. Doane had been admitted and, as at least two of the witnesses then in the room stated, as soon as Mr. Graydon was able to interrupt her, he informed her that he had found that a mistake had been made and that they, the Graydons, were then leaving the place. Mr. Doane had entered meanwhile and Graydon proceeded toward the door. Mrs. Doane called out, ''Come on, come on,'' evidently addressing Bowers and Maybelle Roe, for the two latter appeared at the front door facing Graydon as he was about to make his exit. The testimony of both the taxicab driver and Mrs. Graydon is to the effect that immediately Maybelle Roe struck Graydon over the head, Mrs. Graydon said with something similar to the article which was afterward found in the possession of

Maybelle Roe and being that which is commonly called a "blackjack." The testimony was that Bowers proceeded also to attack Graydon, and in a moment the three men were outside the door struggling, Bowers and Doane against Graydon, with the latter striving to defend himself. Mrs. Graydon endeavored to go to the assistance of her husband. She was struck over the head by Maybelle Roe. Recovering herself, she went into the house and procured what she said was a "bill file," returned and, using the file as a weapon, struck Maybelle Roe on the head. The fight progressed to a point where Graydon was on his knees. Mrs. Graydon's sister described his position as follows: "Mrs. Doane and Mr. Bowers were in back of him, and Mr. Graydon's hands were pinioned behind his back, and his face was black and his eyes were closed, and his head was bent back and his knees were sagging forward. I thought he was dead from the appearance; and just then I was conscious of a movement from the sidewalk, and I saw Maybelle Roe lurch out from the side and she had a gun in her hand. It was so quick—she took the gun in both hands like this and she fired." The three witnesses, to wit, Joan Marshall, Mrs. Graydon, and the taxicab driver Atkins, all agreed that Mrs. Roe went behind Graydon while he was being held by Bowers and Doane, and holding a blue-colored weapon in both hands, very close to Graydon's back, fired the shot from the effect of which Graydon died the next day. There was ample testimony to show that prior to being shot Graydon's head and face had been struck with hard instruments which created abrasions, bruises, and blackened spots. A near-by resident who, from her home which was very close to the Doane house, heard the shot, observed the participants in the affray, and heard Bowers say, immediately after the shot was fired, "You —— ——, if that don't finish you, I have something that will." When these words were uttered Bowers was standing at the back of Graydon. This witness then saw Bowers stoop down and, as she said, he "seemed to pick up something off the lawn, when he and the woman who has been designated as Mrs. Roe went around to the back of the house." The weapon with which the shooting was done was never found. The police officers who arrived on the scene discovered appellant and Maybelle Roe seated in the automobile, the engine of which had been started.

Maybelle Roe had in her possession the "blackjack" and in one of Bowers' pockets was found a pair of metal "knuckles." These two persons each stated to the officers that they had taken the "blackjack" and "knuckles" from the Graydons. A lady who lived in the neighborhood was asked by the police officers to search the automobile and she testified that she made a thorough examination of it but failed to find any weapon or ammunition of any kind. A short while later the officers made a second search and discovered under the floor mat in the rear of the machine several cartridges. According to one witness at least, between the time that the lady referred to had searched the machine and the time when the cartridges were found, Doane was seen to go to the automobile, get up on the running-board, and do something at that place. The admission of the testimony as to the presence of the cartridges does not constitute error, because the circumstances were fully explained and it appeared from the testimony that Doane, if anyone, placed them there. A young son of Bowers, of the age of fourteen, testified that on an occasion shortly before the day of the fatal affray, his father and Maybelle Roe were at dinner at a country place, at which he was present, and that, referring to Graydon, Maybelle Roe said that he (meaning Graydon) would "get his," and that Bowers added, "His days are numbered." This witness also testified that his father owned a blue revolver and that he had it in his pocket on August 29, 1920. Another son of Bowers, called by the prosecution, testified that a number of years prior to the trial he knew that his father kept a pair of "brass knuckles." We think that it was not error to admit the testimony as to the prior possession of the "knuckles," even though the time of that possession was quite remote from the date important here. It was a circumstance to be given such weight as the jury might deem it entitled to in considering the denial of the appellant that the "knuckles" found in his possession immediately after the tragedy belonged to him. The marks and bruises on the face of Graydon were such as might well have been produced by the metal "knuckles," as appears by the testimony of a surgeon who was examined as a witness. Instructions were offered by both prosecution and the defendant and given by the court upon the subject of the responsibility of a conspirator.

The correctness of the instructions is not challenged, but it is claimed that the evidence was insufficient to establish the fact of conspiracy. Assuming that premise, appellant argues that Bowers could not be convicted where it was shown that he did not fire the shot that killed Graydon. But we think that it is not necessary to consider the question as to whether a conspiracy existed, for plainly on the evidence produced by the prosecution Bowers was a coparticipant and an accomplice of Maybelle Roe in the commission of the crime. We have already indicated that state of the evidence which shows that Maybelle Roe and Bowers acted with mutual purpose and intent, and that intent plainly was to commit great bodily injury upon Graydon, even to the extent of killing him. That Bowers himself used a weapon capable of producing a serious injury is fairly shown by the evidence; that he countenanced and approved of the acts of Maybelle Roe is shown by his own words uttered at the moment of the tragedy. In addition to the statements already attributed to him, as shown in the record, there was testimony of a further statement of Bowers made before the Graydons started to leave the house, when, addressing a vile name to Graydon, he said to him that he had better come out, and that when Mrs. Doane came he (Graydon) "would come out differently from the way he went in."

The fact that it was through an error of the county clerk that the writ of restitution was issued is not, to our minds, important in the case. The Graydons were installed in the possession of the house peaceably, and, if that possession was wrongful, the Doanes had redress by application to the court. Neither the Doanes nor this appellant were armed with any process authorizing them to eject the Graydons from the house, and, moreover, as we have shown, the testimony for the prosecution was clear to the point that the Graydons, when they learned of the error and before being attacked by this appellant and Maybelle Roe, announced their intention to leave, and were then endeavoring to do so and surrender possession in a peaceable manner. We find no error in this record justifying the claim that the appellant has been deprived of, or interfered with in his right to, a fair trial.

The judgment and order are affirmed.

Conrey, P. J., and Shaw, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on February 3, 1922, and a petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on March 6, 1922.

All the Justices concurred.

Lennon, J., was absent and Richards, J., *pro tem.*, was acting.