[Crim. No. 2423. In Bank.—September 18, 1922.]

THE PEOPLE, Respondent, v. MAYBELLE ROE, Appellant.

[1] CRIMINAL LAW—MURDER—SELF-DEFENSE—PROVOKING OF ASSAULT. The rule that one cannot by the commission of a felonious assault provoke a deadly counter-attack upon himself and in the course of the counter-attack kill the assailant and then invoke the defense of self-defense or the defense of the person of another, has no application to a prosecution for murder where the evidence is in complete and irreconcilable conflict not only as to the purpose and intent with which the defendant and her codefendants entered the home of the deceased, but also as to the nature and magnitude of the initial assault, and as to whether or not the deceased or the defendant and her codefendants were the first aggressors in that assault.

[2] ID.—INSTRUCTIONS—POINTS PERTINENT TO ISSUE.—The provisions of sections 1093 and 1127 of the Penal Code contemplate and require that the trial court's charge to the jury must be applicable and confined to the points pertinent to the issue, and the charge may not, without error, even though correctly stating abstract legal principles, be extended beyond such limitation to the point of covering an assumed issue which finds no support in the evidence, or which the undisputed evidence in the case shows does not exist.

[3] ID.—INAPPLICABLE INSTRUCTION—WHEN ERRONEOUS.—While there may be exceptional cases in which an inapplicable instruction will not operate to the prejudice of a defendant in a criminal case, yet when it is clear that such an instruction is well calculated to mislead the jury and in all likelihood affected their conclusion to the prejudice of the defendant upon the only issue in the case, the giving thereof, even though correct in principle, constitutes

error equally as grave as the giving of an instruction fundamentally wrong.

[4] ID.—EVIDENCE—SELF-DEFENSE—IMPROPER INSTRUCTION.—Where in a prosecution for murder, it was shown as an uncontradicted fact that when the defendant killed the deceased, the deceased and her codefendant were locked in a death struggle, and there was no evidence that at the time of the killing the deceased attempted or contemplated an assault upon the defendant, an instruction should not have been given upon the law of self-defense at the request of the people.

[5] ID.—DEFENSE OF PERSON OF ANOTHER—CONFUSING INSTRUCTIONS. Where in a prosecution for murder the only defense interposed and relied upon by the defendant and which was available to her was that of the defense of the person of another, instructions upon the law of self-defense given at the request of the people that "in order to justify a killing upon the ground of self-defense, it must have appeared to the slayer, as a reasonable person, that the danger, if any, was so urgent and pressing that in order to save his own life or to prevent his receiving great bodily harm the killing was absolutely necessary . . . ; that the killing was done under a well-founded belief that it was necessary for the defendant to kill the deceased at the time to save himself from death or great bodily harm . . . ; that the slayer had really and in good faith endeavored to decline further trouble before the fatal shot was fired," were confusing and prejudicial.

[6] ID.—PROOF BY PREPONDERANCE OF EVIDENCE—ERRONEOUS INSTRUCTION.—An instruction in such prosecution that a preponderance of the evidence was necessary to the establishment of the essentials of the defense of the person of another was erroneous.

[7] ID.—APPEAL—CONSIDERATION OF EVIDENCE—CONSTITUTIONAL LAW. While it is true that section 4½ of article VI of the constitution confers upon the appellate court the power to weigh, to a limited extent, the evidence in its entirety upon which a conviction has been had, the court is not to determine, as an original inquiry, the question of the defendant's guilt or innocence, but whether any error committed has led to the verdict which was reached.

[8] ID.—VERDICT ON PROPER INSTRUCTIONS—IMMATERIALITY.—It is not a matter of consideration when applying section 4½ of article VI of the constitution to erroneous instructions that another jury upon a new trial might upon the conflicting evidence and proper instructions render a verdict of guilty.

[9] ID.—JUSTIFICATION OF HOMICIDE—DEGREE OF PROOF.—While section 1105 of the Penal Code casts upon a defendant the burden

5. Killing in defense of person other than relative as excusable homicide, note, 13 Ann. Cas. 1129.

of proving circumstances that justify or excuse the commission of a homicide, it does not mean that he must prove such circumstances by a preponderance of the evidence, since he is only bound to produce such evidence as will create in the minds of the jury a reasonable doubt of his guilt of the offense charged.

[10] ID. — INSTRUCTIONS — PRESUMPTION OF INNOCENCE — PROOF OF GUILT—ERRONEOUS INSTRUCTION AS TO PROOF OF DEFENSE NOT CURED.—The giving of the usual instructions as to the presumption of innocence and the fact that the defendant's guilt must be established beyond a reasonable doubt, does not render harmless an erroneous instruction imposing upon the defendant the burden of establishing by a preponderance of the evidence her sole defense that the killing was done in defense of the person of another.

APPEAL from a judgment of the Superior Court of Los Angeles County. Frederick W. Houser, Judge. Reversed.

The facts are stated in the opinion of the court.

Davis, Rush & MacDonald, Alfred F. MacDonald, Wm. B. Beirne, A. C. Verge, O. V. Willson and J. B. Joujon-Roche for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

LENNON, J.—This case is here on rehearing after decision of the district court of appeal, first division, second district, reversing the judgment of the trial court. Upon behalf of the people it was earnestly contended in the district court of appeal, as is contended here, that the trial court's instructions to the jury upon the subject of self-defense—held by the district court of appeal to be beyond the issues raised in the case and therefore confusing to the jury and prejudicial—were, in fact, helpful rather than harmful to the defendant's case, even though the claimed defense of the person of another against a felonious and deadly assault was the only defense which was interposed by the defendant to the charge of murder upon which she was tried and convicted. In this behalf it is the contention of the attorney-general that the evidence educed upon the whole case shows that the defendant was not entitled in any event to interpose the defense of self-defense or the corelated defense of the defense of the person of another, and that, there-

fore, neither the instructions given upon the subject of self-defense, nor that instruction which erroneously required the defendant to show by a preponderance of evidence certain essentials necessarily involved in the only defense interposed, viz.: the defense of the person of another, can be held to have operated to the prejudice of the defendant. With reference to the latter instruction it is further contended that even though it should be held that the defendant was entitled to have the jury instructed upon the law relative to the right of one person to make a defense of the person of another, still the evidence educed upon the whole case points so overwhelmingly to the guilt of the defendant that it may be fairly said the verdict of the jury would have been the same even if the admittedly erroneous instruction had not been given, and, therefore, it is insisted that the judgment should be affirmed pursuant to the provisions of section 4½ of article VI of the constitution.

[1] These contentions, as we read and understand the briefs filed in behalf of the people's case, rest upon the erroneous assumption that the evidence as a whole shows overwhelmingly that the affray in which the deceased was killed by the defendant, Maybelle Roe, was instigated and consummated by her, acting in conjunction with three co-defendants jointly indicted with her, pursuant to a conspiracy entered into by all of said defendants which had for its sole purpose a felonious and murderous assault upon the deceased, and, further, that the evidence shows that, with such purpose and intent, said defendants entered the home of the deceased, where the altercation commenced, and which culminated, on the lawn of the home of the deceased, in the death of the deceased by the hand of the defendant, Maybelle Roe. With this assumption as a premise, it is argued that both the right of self-defense and the defense of the defense of the person of another were foreclosed to the defendant upon the theory that it is the law that one who willfully and deliberately, for the purpose of creating a necessity for self-defense, provokes, by the commission of a felonious assault, a deadly counter-attack upon him, cannot, because of and in the course of the counter-attack, kill his assailant and then invoke the defense of self-defense or the defense of the person of another who, as the result of the original assault, became involved in and was being subjected to the deadly

counter-assault. Although not embodying a full exposition of the law of self-defense, still, generally speaking, the theory contended for in this behalf comports with a fundamental feature of the law of self-defense as settled and accepted in this jurisdiction, but obviously it can have no application to a situation where, as in the instant case, the evidence adduced upon the whole case is in complete and irreconcilable conflict not only as to the purpose and intent with which the defendant, Maybelle Roe, and her co-defendants entered the home of the deceased, but also as to the nature and magnitude of the initial assault, and as to whether or not the deceased or the defendant, Maybelle Roe, and her codefendants were the first aggressors in that assault. (*People v. Travis,* 56 Cal. 251; *People v. Hunt,* 59 Cal. 430; *People v. Hecker,* 109 Cal. 451 [30 L. R. A. 403, 42 Pac. 307]; *People v. Kennett,* 114 Cal. 18 [45 Pac. 994]; *People v. Worthington,* 115 Cal. 242 [46 Pac. 1061].)

It may be conceded that the evidence educed in support of the people's case and relied upon for a conviction, if it stood alone, would suffice to support the verdict. And, of course, if that were the only evidence offered and received in the case, there would be little reason for contending that the inapplicable and admittedly erroneous instructions complained of were prejudicial to the defendant's case. But opposed to this evidence, the record shows facts and circumstances leading up to and attending the killing of the deceased, as disclosed by the evidence educed in support of the defense, which, if believed by the jury, would have tended to create a reasonable doubt of the defendant's guilt, and yet, even though believed by the jury, may well have been held by it, under the erroneous instructions of the trial court, to be lacking in the preponderance which said instructions declared was necessary to overcome the evidence educed in support of the people's case. In this behalf the record shows the evidence offered and received in behalf of the defendant to be as follows:

Mrs. Julia Doane was the owner of a certain dwelling house on Sherman Avenue, in Venice, California, which she rented on September 5, 1919, to McCullough Graydon, the deceased. At various times there had been considerable controversy over the payment of the rent. Finally Mrs. Doane raised the rent, and, when the Graydons failed to pay the

increase, served them with notice terminating their tenancy. Graydon maintained that he had a lease of the premises for a year, while the Doanes insisted that his was a month to month tenancy only. The Graydons continued to occupy the house until May 10, 1920, when they left, taking all their belongings with them with the exception of a sewing machine, which Mr. Graydon ordered turned over to the sewing machine company. About a week after their departure, Doanes took possession, and on July 17th rented the house furnished for two months at a rental of $150 per month. Graydon sued for possession of the premises, and on July 24th a writ of possession was directed to the sheriff, which resulted in Mrs. Doane's tenants being dispossessed on the 28th of that month.

On August 30th, at about five o'clock in the afternoon, Mr. Graydon applied at the county clerk's office for a writ of possession. Before issuing the writ the clerk in charge asked Graydon if a bond on appeal had been filed, to which he replied in the negative. However, prior to the issuance of the writ of restitution, and on August 27th, Mr. Burr, attorney for Mrs. Doane, went to the county clerk's office to file an appeal bond in the case of *Graydon* v. *Doane.* Mr. Graydon was at one of the counters, and Mr. Burr inquired of him whether he had the files in that case, stating to Graydon that he was filing a bond on appeal and wanted to check up some dates. He also mentioned that this was to stay any execution that might issue in the case. August 31st was a holiday, and it was not until the clerk checked up the register of actions on the morning of September 1st that the discovery was made that a bond had been filed and that the writ was erroneously issued.

At about 10:30 on the morning of September 1st Mr. Doane went to the Sherman Avenue house for the purpose of verifying a bill for some plumbing repairs, and met the deputy sheriff there, who told him that Mr. Graydon had been put in possession of the house. Doane returned home, and, after getting into communication over the telephone with Mr. Burr, went back to the Sherman Avenue house and ascertained that the sheriff had left. He thereupon told Mr. Graydon that a mistake had been made in giving him possession of the premises, and again left for home, where he

received a telephone message requesting him to go to 36 Sherman Avenue.

When Mrs. Doane's attorney, Mr. Burr, learned on September 1st of the clerk's error in issuing the writ of restitution, and that Mr. Graydon had been put in possession of the house, he got in communication with Mr. Oscar A. Bowers, and asked the latter to drive down to Venice and inform Mr. Graydon that the place had been turned over to him by mistake, and told Bowers that if he would get word to the deputy sheriffs in Venice to get in touch with the sheriff's office in Los Angeles, the deputies would be instructed not to levy the writ. Bowers then communicated with the sheriff's office, and they also asked him to deliver the message to Graydon.

Bowers lived with the Roes at their home in Los Angeles, and invited appellant, Maybelle Roe, who had been in ill health for some time, to accompany him on the trip to Venice. They went first to Mrs. Doane's millinery store, and not finding either of the Doanes there, drove to the Sherman Avenue house. When Mr. Doane, in response to the telephone message, arrived at the Sherman Avenue place, he found Bowers and Mrs. Roe on the walk in front of the house. Bowers spoke to him about the mistake that had been made, and told him that the sheriff said to call up the latter's office and that the Doanes could demand possession of the house. Doane then went up on the porch and knocked on the door. Mr. Graydon did not open the door, but talked to him through the window. He asked Graydon to give up possession of the house, but the latter refused. Doane then left and tried, without success, for at least a half hour, to get the sheriff's office at Los Angeles on the telephone. He started back to the house, and saw Mrs. Doane going up the steps. He followed her up the steps and into the house as the door was opened. Mr. and Mrs. Graydon, Miss Marshall and a taxicab driver were there. Bowers and Mrs. Roe sat in the automobile for some time, and Bowers suggested that as neither the sheriff's deputies nor the Doanes had come they perhaps had better return to the city. Mrs. Roe then went up to the house, and, seeing Mrs. Doane there, motioned for Bowers to come up. When he and Mrs. Roe reached the front of the house, Mrs. Doane was looking through the door and Mr. Doane was standing

as if he were just entering the house. Mrs. Roe called to
Mrs. Doane, and the latter said she wanted Bowers and
Mrs. Roe to come in and verify the statement the sheriff had
made. Mr. Graydon remarked: ''They can't come in here.
You will have no witnesses to any conversation in this house
to-day.'' And Mrs. Graydon said: ''If Mrs. Roe comes in
here I will kill her.''

They walked up on the porch, Mrs. Roe preceding Mr.
Bowers, and when the former reached the door, ''Mr. Gray-
don came through the door at an angle about forty-five,
struck Mrs. Roe right in the face, knocked her glasses off,
knocked her right down in the corner on the porch right
by the door.'' Neither Bowers nor Mrs. Roe had said a word
up to that time. Bowers then stepped up to catch Mrs.
Roe and prevent her falling through the glass doors. He
asked Graydon why he had struck her, whereupon Graydon
''reached right back out of the door and struck me (Bowers)
right over the right eye with a pair of knucks, and immedi-
ately struck me again on this side,'' and at about the same
moment Mrs. Graydon rushed in the doorway and hit Mrs.
Roe over the head with a blackjack. Bowers had his hands
out to keep Mrs. Roe from falling, when Graydon grabbed
him by the wrist, ran his arms around behind him, and
Mrs. Graydon and Miss Marshall beat him over the head
and shoulders. Mr. Doane, a man of about seventy years,
tried to separate the two men fighting on the porch, but
Graydon picked Bowers up and carried him bodily down
on the walk. Mr. Doane's sight is very poor, one eye
having been lost in an operation and the other having
only partial sight. By the time he felt his way down the
steps Mr. Graydon had Mr. Bowers on the ground and was
on top of him. They struggled across the lawn and then
back again to the center of the yard, and stood, ''Mr. Gray-
don on the right of Mr. Bowers, with his left arm over his
shoulder, around his neck, and choking him,'' Mrs. Graydon
then ran out after Mrs. Roe, and Miss Marshall sprang off
the porch and hit Mrs. Doane ''with something hard,'' and
they both fell to the ground. From the blows he received
while on the porch Bowers was rendered unconscious, and
the next thing he realized he was lying on the lawn and
Graydon had slipped up Bowers's necktie and was drawing it
so tight that Bowers could not breathe. Bowers's eyes were

bulging out of his head and his tongue was hanging out. Mrs. Roe pleaded with Graydon not to hurt Bowers, as he was a cripple, to which Graydon replied: "I don't give a damn if he is; I am going to kill him anyhow." Mrs. Roe again begged Graydon not to kill Bowers, and then went back to the porch, and "Miss Marshall came in the house, and she run out and knocked Mrs. Doane down, and I (Maybelle Roe) saw a revolver in her hand, and I grabbed the revolver and fired; I grabbed the revolver away from her and fired," and then dropped the revolver on the ground. She fired the shot because she thought Graydon was killing Bowers. In falling, Mr. Graydon struck his face on the bricks that were set at an angle on the edge of the grass plat.

After the shooting, Mrs. Graydon handed Mrs. Roe her handbag, and the latter and Mr. Bowers went back to their automobile. They just started the car when the police officers arrived and arrested them. When Mrs. Roe opened up her handbag to take out her handkerchief in order to wipe the blood from her head, she found the blackjack. It was the first time she had seen it. Neither Bowers nor Mrs. Roe had gone to the house armed with a set of brass knuckles or a blackjack. Although the officers took a pair of knuckles from Bowers's pocket, he claims that he never owned or carried a pair of them.

From the evidence in defendant's behalf it appears that Mr. Graydon had made threats against Mrs. Doane on several occasions. Mrs. Florence A. Rennie, who was engaged in the real estate business in Venice, testified that in a conversation with Mr. Graydon sometime during the middle or latter part of August, he said, referring to Mrs. Doane, that "he would get that old woman and all she had." Sometime during the month of May Graydon also said to Donald H. Gray, a grocer, in speaking of the damage suit against Mrs. Doane: "I am going to get every cent that old woman has got; I will make her look like a dirty deuce." Gray said that he would rather give up the house than have such inharmonious conditions, to which Graydon replied: "My God, I would kill that old woman before I would give up the house."

With regard to the injuries received by the defendants, Bernice Hartley, who was acting as assistant matron at the

county hospital when Mrs. Roe was taken to the county jail, testified that the latter had a cut on the left side of her head about three inches long, and a "bump" on the right side perhaps half as large as an egg.

Mr. Burr, the attorney, saw Mrs. Roe at the jail in Venice about 5:30 on the afternoon of the homicide, and stated that she had a lump on her head, and her hair was thickly matted with blood. He also saw Mr. Bowers, who had an abrasion on his forehead about two and a half inches long, and other smaller cuts on his forehead; also a black eye.

George M. Lingo, who was connected with the Venice police department as a desk sergeant, saw Mrs. Roe and Mr. Bowers when they were first brought to the police station. While he did not make any particular examination to ascertain the extent of their injuries, he noticed that Mrs. Roe had a "puffed place well towards the front on the top of her head," that there was blood on her face and some in her hair.

Edwin F. Jackson, engineer in the Bank of Italy building, saw Mr. Bowers on September 7th at the county jail. Bowers's eye had been blackened, and he noticed several scalp bruises and marks on his forehead; also the skin "had been knocked off" of Bowers's crippled arm. Under correct instructions the jury, when weighing the evidence of the defense, as above narrated, may well have entertained a reasonable doubt as to whether the defendant proceeded to the home of the deceased with any other purpose than to aid in peaceably regaining possession of the premises which one of her codefendants owned, and that in so doing neither she nor her codefendants had a preconceived intent of provoking a deadly quarrel with the deceased. In short, if there be evidence, as we are satisfied there is, sufficient, if believed, to have warranted, under the rule of reasonable doubt, a finding that the affray out of which the killing of the deceased ultimately resulted, was, at its inception, not more than a simple assault upon the deceased, then the deceased would not have been justified in using any greater force than would have been necessary to have defended himself against and repelled such assault. (*People* v. *Hecker, supra.*) And if, as the defendant claims and the evidence introduced in her behalf tends to show, the deceased in

retaliation of a simple assault, or a simple trespass, committed a felonious and murderous assault upon her codefendant Bowers, then it cannot be said that the right of the defense of the person of Bowers against the consummation of such felonious and murderous assault may be rightfully denied to the defendant, Maybelle Roe. This being so, said defendant justly complains of that instruction concerning a vitally essential feature of her defense, which put upon her a greater burden of proof than that exacted by the law, and that instruction, coupled with the confusion which must have been created in the minds of the jurors as to what her real defense was by the giving of other instructions wholly foreign to the issue, operated to prevent the jury from adequately comprehending and correctly considering the only defense interposed in her behalf. This was tantamount to depriving her of any defense whatever.

[2] It is true, as has been suggested, that under the provisions of sections 1093 and 1127 of the Penal Code "the Judge may . . . charge the jury, and must do so on any points *pertinent to the issue,* if requested by either party . . . ," and "In charging the jury . . . must state to them all matters of law necessary for their information." It needs no argument, we take it, to demonstrate that the provisions of the above-quoted sections contemplate and require that the trial court's charge to the jury must be applicable and confined to the "points pertinent to the issue," and to such matters of law as may be necessary for the information of the jury. This being so, the charge of the trial court may not, without error, even though correctly stating abstract legal principles, be extended beyond such limitation to the point of covering an assumed issue which finds no support in the evidence, or which the undisputed evidence in the case shows does not exist. (Hughes' Instructions to Juries, sec. 80, p. 70; 1 Blashfield Instructions to Juries, 2d ed., sec. 82, pp. 183–186; *Garcia* v. *State* (Tex. Crim. App.), 61 S. W. 122; *State* v. *DeWolfe,* 29 Mont. 415–426 [74 Pac. 1084]; *Aguirre* v. *Alexander,* 58 Cal. 21; *People* v. *Dallen,* 21 Cal. App. 770 [132 Pac. 164]; *Maines* v. *State,* 35 Tex. Crim. 109 [31 S. W. 667]; *Comptoir* v. *Dresbach,* 78 Cal. 15 [20 Pac. 28]; *In re Calkins,* 112 Cal. 296, 304, 305 [24 Pac. 577].)

The error of inapplicable instructions rests in the fact that they pertain to points not "pertinent to the issue," and contain matters of law for the jury's consideration not "necessary for their information," and, therefore, instead of enlightening, tend to confuse and mislead the jury. This is so because such instructions, in effect, either create a false issue or constitute a misstatement of the real issue, thereby distracting the attention of the jury from and befogging the real issue.

[3]   There may be, of course, exceptional cases in which an inapplicable instruction will not operate to the prejudice of a defendant in a criminal case, but when it is clear, as it seems to us in the instant case, that such instructions are well calculated to mislead a jury, and in all likelihood affected their conclusion to the prejudice of the defendant upon the only issue in the case, the giving thereof, even though correct in principle, constitutes error equally as grave as would be the giving of instructions fundamentally wrong. (*People* v. *Devine*, 95 Cal. 227 [30 Pac. 378].)

[4]   That the killing was done in the instant case while Graydon, the deceased, and Bowers, the codefendant of the defendant Maybelle Roe, were locked in a death struggle, is an uncontradicted fact. There is no evidence that at the time of the killing Graydon attempted or contemplated an assault upon the defendant Maybelle Roe. No claim was made, and none could be successfully made, under the evidence educed, either for the prosecution or the defense, that at the time of the killing, Graydon, the deceased, was making an assault upon the defendant, Maybelle Roe. This being so, said defendant would not have been entitled as a matter of right, as she otherwise would be, to an instruction upon the law of self-defense. And, of course, if the trial court would have been justified in refusing such an instruction, at the request of defendant, because not pertinent to the issue in the case, then, for the same reason, the trial court was precluded from giving such an instruction at the request of the people.

[5]   That the several instructions upon the law of self-defense, given to the jury at the request of the people, were calculated to confuse the jury and must have prejudiced the defendant's case, is affirmatively shown, we think, by the fact that they charged the jury that "in order to justify a killing upon the ground of self-defense, it must have

appeared to the slayer, as a reasonable person, that the danger, if any, was so urgent and pressing that in order to *save his own life* or to prevent his *receiving great bodily harm* the killing was absolutely necessary . . . ; that the killing was done under a well founded belief that it was necessary for the defendant to kill the deceased at the time to save himself from death or great bodily harm . . . ; that the slayer had really and in good faith endeavored to decline further trouble before the fatal shot was fired.'' While it is true that these and other instructions upon the same subject did not in terms refer to the defendant Maybelle Roe, nevertheless they did refer ''to the defendant'' and to the ''slayer,'' and Maybelle Roe was the defendant and admittedly the ''slayer.'' Therefore, no matter how abstractly the subject matters of the instructions were stated, it is idle to contend that said instructions had no reference to the defendant in the case, and if the jury applied, as doubtless they did, the requirements of said instructions to the situation of ''the slayer'' at the time of the killing, they could not fail to find, in the face of the undisputed fact that she was not being assailed by the deceased at the time of the killing, that it was not necessary for her to kill the deceased in order to save herself from death or great bodily harm, and, therefore, in keeping with the charge of the court, the jury had no alternative but to find the defendant guilty upon the fictitious issue of self-defense, which was, by the instructions complained of, created and injected into the case in conflict with and to the confusion of the defense of the person of another, which was the only defense interposed and relied upon by the defendant, and which, under the evidence bearing upon the situation of the defendant, at the time of the killing, was the only defense available to her.

[6] No instructions were given which tended in any degree to cure the error of the instruction which erroneously charged the jury that a preponderance of the evidence was necessary to the establishment by the defendant of the essentials of the defense of the person of another. While instruction number 39, and similar instructions, did charge the jury, in effect, that if the defendant, Maybelle Roe, killed the deceased ''reasonably believing it was necessary'' to do so to save her codefendant Bowers from a murderous assault, still

this instruction, assuming it to be in its entirety a correct exposition of the law in the particulars stated therein, must be read in conjunction with the admittedly erroneous instruction, and when so read, necessarily required the jury to be satisfied, *by a preponderance of the evidence,* that she had reasonable cause to believe in the necessity for acting in the defense of Bowers, whereas the law required from her upon that phase of the case only such proof as would create a reasonable doubt in the minds of the jury. [7] While it is true that section 4½ of article VI of the constitution confers upon this court the power to weigh, to a limited extent, the evidence in its entirety upon which a conviction has been had, still "we are not substituted for the jury. We are not to determine, as an original inquiry, the question of the defendant's guilt or innocence." We are to "decide whether, in our judgment, any error committed *has led* to the verdict which was reached." (*People* v. *O'Bryan,* 165 Cal. 55 [130 Pac. 1042].) We are satisfied that the verdict of guilty was arrived at by the aid of the inapplicable and admittedly erroneous instructions, and this is so, in our judgment, because they obviously obscured and crippled the defendant's defense to the extent practically of denying to her the right of any defense at all. We are fortified in this conclusion by the fact that a careful review of the cold record before us shows the evidence, educed upon the whole case, to be in irreconcilable conflict and closely balanced, in weight and quality, for and against the guilt of the defendant.

The fact that the district court of appeal held the conviction of Bowers, upon a separate appeal from a verdict and judgment of conviction obtained, upon a separate trial, to be sustained by the evidence in that particular case, does not militate against the conclusion reached by the same court of appeal, in the instant case, that the errors complained of operated to the prejudice of the defendant and contributed materially to the verdict; nor can the verdict in the Bowers case be considered by us in arriving at a similar conclusion, for the reason that the record of the proceedings had and the evidence educed in that case is not before us, and therefore we do not and cannot know that the defense interposed and the situation, in so far as the evidence in its entirety is concerned, were the same. [8] Nor is it a mat-

189 Cal.—86

ter for consideration, when applying section 4½ of article
VI of the constitution, that another jury upon a new trial
might upon such conflicting evidence and proper instruc-
tions render a verdict of guilty. (*Young* v. *Southern Pacific
Co.,* 182 Cal. 369 [190 Pac. 36].) We, therefore, adopt and
approve the conclusion of the district court of appeal, as
expressed in the opinion of Mr. Justice Victor Shaw, as
follows:

"The homicide occurred at the house of McCullough Gray-
don, the deceased, which he occupied as tenant of Julia
Doane, the owner, and who, in company with Oscar A. Bow-
ers, Edward F. Doane and the defendant, had gone to the
house of Graydon, with whom there was a controversy as
to his right to retain possession of the same, and where a
violent altercation, engaged in over the subject of his vacat-
ing the premises, culminated in an encounter wherein all the
parties appear to have participated and in which Graydon
was killed by defendant. As to be expected in such a case,
the testimony upon the question as to how the trouble origi-
nated, who was the aggressor, who participated therein and
the part each took, and for what purpose, whether as peace-
maker or aggressor, is in sharp conflict, added to which was
much evidence of a circumstantial nature, the determination
of all of which questions arising thereon was the province
of the jury under the instructions of the court.

"Appellant attacks the instructions given by the court,
claiming that as to those covering the question of self-de-
fense, while correct statements of abstract principles of law,
they are wholly inapplicable to any issue involved, and that
as to another it embodied a statement of an incorrect and
erroneous rule of evidence which the jury applied in the
consideration of the case.

"Defendant admitted she fired the shot which killed Mc-
Cullough Graydon. Her sole defense was that the act was
committed under circumstances which justified her in be-
lieving it necessary, if not to save the life of Bowers, at
least to save him from great bodily injury, upon which
facts, if established, subject to qualifications stated by the
court in charging the jury, she was entitled to an acquittal.

"While she made no claim of justification based upon
self-defense, and no evidence was offered touching such issue,
the court at great length instructed the jurors as to the law

thereon, among other things, in substance charging them that in order to justify the taking of life upon the ground of self-defense it must not only have appeared to the defendant as a reasonable woman that she had reason to believe and did believe that she was in danger of her life or of receiving great bodily harm, but that her act in killing deceased was not justified unless the jury found that it appeared to her as a reasonable person 'that the danger, if any, was so urgent and pressing that in order to save his (her) own life the killing of the other was absolutely necessary.' While correct statements of abstract propositions of law, the instruction, since there was no evidence touching the question of self-defense, were not applicable to any issue involved. Moreover, they were well calculated to confuse and mislead the jury into a belief that under the instructions they should convict if, as stated by the court, they were satisfied (as they must have been from the evidence) that the defendant did not commit the act because of a belief, reasonable or otherwise, upon her part that her life was in danger, or that she was threatened with great bodily harm from an attack by the deceased. She made no claim of such character. That the giving of the instructions constituted error admits of no doubt. (*In re Calkins,* 112 Cal. 296 [44 Pac. 577]; *People* v. *Maughs,* 149 Cal. 259 [86 Pac. 186]; Hayne on New Trial and Appeal, p. 350.)

"As stated, the defendant justified the homicide in defense of the life and protection of another, as to which the court instructed the jury that if Graydon 'was unlawfully attempting to commit a great injury upon the person of Oscar Bowers, and that the force of the circumstances was sufficient to excite the fears of the defendant as a reasonable woman that the said Graydon would succeed in his attempt to commit a violent injury or do great bodily harm to the person of said Bowers, and she reasonably believed that it was necessary to shoot the deceased to prevent the said Graydon from committing said injury to said Bowers, and acting under such fears and belief alone she fired the shot which killed the deceased, then and in that event I instruct you that she was justified, and . . . you should find the defendant not guilty.' This statement, however, was qualified by an instruction to the effect that the plea of justification upon such ground was unavailing if the assault upon Bowers

by Graydon was procured by the former or made under the appearance of hostility created by Bowers with a view of having his adversary act upon it, in connection with which the court gave an instruction as follows: 'You are further instructed that it being the claim of the defendant that she shot the deceased in order to save the life of Oscar A. Bowers at a time when said Bowers and said Graydon were fighting, the burden is upon the defendant *to prove by a preponderance of the evidence* (italics ours) that said Graydon was the aggressor in said fight, and that said Bowers used all reasonable means to avoid further conflict before she fired the fatal shot.'

[9] "While section 1105, Penal Code, casts upon a defendant the burden of proving circumstances that justify or excuse the commission of a homicide, it does not mean that he must prove such circumstances by a *preponderance of the evidence*. On the contrary, while the burden of showing the circumstances under which the act is justified devolves upon a defendant, 'he is only bound under this rule to produce such evidence as will create in the minds of the jury a reasonable doubt of his guilt of the offense charged.' (*People* v. *Bushton,* 80 Cal. 160 [22 Pac. 127, 549].) Under the instruction given, the verdict of the jury was made to depend upon whether or not they found that Graydon was the aggressor and whether or not Bowers used all reasonable means to avoid further conflict before defendant fired the fatal shot; and they were told to find these facts adversely to defendant unless she established the contrary by a preponderance of the evidence. Such is not the law. Under the instruction the verdict was predicated upon the implied finding that Graydon was *not* the aggressor and Bowers did *not* use all reasonable means to avoid further conflict, which finding as to such negative facts was based upon a preponderance of the evidence, when all that could be demanded of defendant under the law was that she produce evidence sufficient only to create in the minds of the jurors a reasonable doubt as to the existence of the alleged circumstances upon which she claimed justification. Entertaining such doubt, she was entitled to an acquittal without regard to what might appear upon a consideration of a preponderance of the evidence touching the question. Where a defendant justified the act in committing a homicide, the same degree

of proof, no more and no less, is required in the determination of the issue upon which guilt or innocence depends as that which is demanded in establishing the commission of the homicide. 'Any other rule as to the weight of the evidence makes one measure applicable to one part of the case and a different one to another part and leads to confusion.'. (*People* v. *Bushton, supra.*) In the case of *People* v. *Elliott,* 80 Cal. 296, 305 [22 Pac. 207], in discussing a like instruction, the court said: 'The instruction was erroneous for the further reason that it cast upon the defendant the burden of proving circumstances of mitigation or that justified or excused the commission of the homicide *by a preponderance of the evidence,* when it was only necessary that he should introduce evidence sufficient to raise a reasonable doubt as to his guilt or the mitigating circumstances.' See also: *People* v. *Lanagan,* 81 Cal. 143 [22 Pac. 482]; *People* v. *Morris,* 3 Cal. App. 1. [84 Pac. 463]. Under the law it was necessary only that defendant produce evidence the weight of which was sufficient to create in the minds of the jurors a reasonable doubt as to the existence of the alleged circumstances which justified the homicide, and if, based thereon, they entertained a reasonable doubt as to the existence of the same, defendant was entitled to an acquittal. By the instruction as given, defendant was required to produce in her defense evidence of greater weight than that which the law demands, the effect of which is identically the same as though she had been wrongly deprived of evidence touching the subject altogether.

[10] "While the court gave the usual instructions as to the presumption of innocence and the fact that defendant's guilt must be established beyond a reasonable doubt, such instructions cannot be said to render the erroneous instruction referred to harmless. It was directed to her sole defense, which was the only issue tried, and imposed upon her the burden of establishing facts upon which the plea of not guilty was based by a preponderance of evidence, and therefore the giving of the instruction cannot be said to be nonprejudicial, as where the defense is an alibi or based upon a denial of committing the homicide. (*People* v. *Miller,* 177 Cal. 404 [170 Pac. 817]; *People* v. *Wilt,* 173 Cal. 477 [160 Pac. 561].)

"The evidence touching the issue was conflicting. Indeed, there appears to have been a sharp conflict in the testimony of the defendant herself as to her reason for firing the fatal shot, in that while asserting on direct examination that she committed the act in defense of Bowers, she, on cross-examination, in response to the question, 'Well, why did you fire the shot?' stated: 'Because he was killing Mr. Bowers.' And in reply to the question, 'Because who was killing Mr. Bowers?' answered, 'Mr. Graydon.' In response to further questions by the district attorney, she stated: 'I don't know why I fired it. No, I did not fire it at Mr. Graydon; I never fired it at Mr. Graydon.' While in replying to the questions she gave contradictory answers, it was the province of the jury to determine under proper instructions which of the statements was true, just as though they had been made by different witnesses. The same rule applies. The mere fact that her answers were contradictory might, by reason of the conflict, have raised a reasonable doubt in the minds of the jurors, in which case, as we view the law, she should have been acquitted. The judgment is reversed."

Wilbur, J., Sloane, J., Shaw, C. J., Waste, J., and Shurtleff, J., concurred.

LAWLOR, J., Dissenting.—I dissent. In my opinion there are two answers to appellant's contentions concerning the six instructions on self-defense, the soundness of which as propositions of law is not questioned—first, that they were properly given, and, second, that if not applicable the giving of them could not have been misleading. It was the duty of the court to state all matters of law pertinent to the case. (Pen. Code, secs. 1093 and 1127.) The theory of the prosecution was that the Doanes, Bowers and appellant had entered into a conspiracy against Graydon, forcibly and by use of pistols, brass knuckles and a blackjack, to oust him from the premises. Under this theory Graydon would have been justified in taking the law into his own hands against any or all of them and using force against any or all of them proportional to the danger. In such circumstances appellant would not have been warranted in killing him to save the life of any of them. It was therefore the duty of the court, whether requested by appellant or not,

to charge the jury on the subject of self-defense in order to aid them in determining whether Graydon or his adversaries in the affray were at fault at the time appellant intervened and fired the shot. Clearly, the right of appellant to intervene depended upon the situation that was presented to her at the time, keeping in view her acquaintance with all the facts, and the jury could not tell what the legal situation was between Graydon and his adversaries, upon which appellant acted, without instructions on the law of self-defense, for, of course, a mingled question of law and fact was involved. Regarded in this light, the instructions would be equally responsive to the claim of the defense that there was no conspiracy, but that Graydon was the aggressor and was endeavoring to kill Bowers. Moreover, it appears plain to me that these instructions were stated as general propositions of law. The words "defendant" and "slayer" were used, but in the abstract in each instance, and upon no theory can it be claimed they would not have applied to Graydon and his adversaries. But even if it be conceded the instructions were improperly given, I do not see how the jury could possibly have been misled into assuming appellant must be convicted unless she reasonably believed her own life or her bodily safety was in danger, in view of numerous other instructions which were given, particularly No. 39 proposed by appellant, wherein the jury were repeatedly told that if appellant killed Graydon reasonably believing it was necessary to save Bowers from great bodily injury as a result of an unlawful attack by Graydon, she should be acquitted.

Nor do I think the erroneous use of the phrase "by a preponderance of the evidence" instead of "sufficient to raise a reasonable doubt" calls for a reversal of the judgment. Misdirection of the jury is one of the errors contemplated by section 4½ of article VI of the constitution. The majority opinion proceeds on the theory that because there is a conflict in the evidence, and that there is evidence sufficient, if believed, to have warranted a finding in favor of appellant under the rule of reasonable doubt, it cannot be held the erroneous instruction did not work a miscarriage of justice.

But as I understand the constitutional provision, our inquiry does not end when such a condition is presented on appeal. We must examine the record, not alone for the pur-

pose of determining whether the jury could have arrived at a different result, but also to weigh the probabilities of whether or not the error had in fact worked a miscarriage of justice. It was said in *People* v. *O'Bryan,* 165 Cal. 55, 65 [130 Pac. 1042, 1046], discussing this provision of the constitution: "This much, however, we think may be safely said. Section 4½ of article VI of our constitution must be given at least the effect of abrogating the old rule that prejudice is presumed from any error of law. Where error is shown it is the duty of the court to examine the evidence and ascertain from such examination whether the error did or did not in fact work any injury. The mere fact of error does not make out a *prima facie* case for reversal which must be overcome by a clear showing that no injury could have resulted. . . .

"The final test is the opinion of the appellate court upon the result of the error. No doubt this view requires the court, to some extent, to weigh the evidence, and form conclusions upon its weight—a function which, heretofore, has been reserved for the jury. But it cannot be doubted that the legislators, in proposing the amendment, and the electors, in adopting it, intended to put upon the courts the performance of just that function. We are not substituted for the jury. We are not to determine, as an original inquiry, the question of the defendant's guilt or innocence. But, where the jury has found him guilty, we must, upon a review of the entire record, decide whether, in our judgment, any error committed has led to the verdict which was reached. If it appears to our satisfaction that the result was just, and that it would have been reached if the error had not been committed, a new trial is not to be ordered."

It does not follow, therefore, that it is sufficient to justify a reversal upon the ground the instruction was prejudicially erroneous that the evidence is in conflict and would sustain a contrary finding; it is the duty of the court to examine the record, including the evidence, in order to determine whether the error actually worked any injury, the burden of showing prejudice being on the party asserting the error.

In my opinion it is altogether improbable that the error affected the verdict. Briefly summarized, the evidence on behalf of the people was to the effect that before the fatal meeting Doane telephoned Bowers requesting him to go to

Venice and give notice that a bond on appeal had been filed, staying execution of the judgment under which Graydon held possession of the property. Bowers thereupon got appellant and proceeded to the house where the shooting occurred. It appeared that both Bowers and appellant had previously taken sides in the dispute between the Doanes and the Graydons over the right to the possession of the premises; that appellant had once before accompanied Mrs. Doane to the house while Mrs. Graydon was there, and had taken an active part in the argument which ensued. The evidence shows that on the occasion in question Bowers and appellant arrived at the house and called to the Graydons, who were inside, knocking on the windows and the door and using profane language; that Mrs. Graydon left and went to the police station to secure help, but was unsuccessful and secured a taxicab to take her home; that she endeavored to purchase a revolver at a hardware store, but was unable to do so; that Graydon informed Mrs. Doane, after the latter arrived on the scene, that a mistake had been made and that he and his wife were leaving; that meanwhile Mr. Doane entered the house and that Mrs. Doane called out to the others to come on in.

The testimony of both the taxicab driver and Mrs. Graydon is to the effect that appellant immediately struck Graydon over the head with something which Mrs. Graydon said was similar to the blackjack afterwards found in appellant's handbag. It was testified that Bowers also proceeded to attack Graydon and that in a moment the three men were struggling outside the door, Graydon against Bowers and Doane, with Graydon trying to defend himself. Mrs. Graydon endeavored to go to the assistance of her husband, but was struck over the head by appellant. Recovering herself, she went into the house and procured what she said was a bill-file, with which she struck appellant over the head. The struggle progressed to a point where Graydon was on his knees. He had been standing facing the porch, and his hands were held to his back, Mrs. Doane and Bowers in front of him and Doane behind him. His eyes were closed as he sank to his knees. At this point appellant went behind Graydon while he was being held by Bowers and Doane, holding a blue revolver in both hands, and standing close to him, shot him in the back. This testimony was

corroborated by Mrs. Graydon and the taxicab driver. There was evidence that before the shooting Graydon's head and face had been struck with hard instruments which caused abrasions, bruises and blackened spots. A neighbor from her home close by heard Bowers say, immediately after the shot was fired, "You —— ——, if that don't finish you, I have something that will." The same witness testified that Bowers, who was still behind Graydon, picked something up off the lawn and that he and appellant went around behind the house. The revolver was never found.

When the police arrived in response to a summons by Mrs. Graydon and her sister, they found appellant and Bowers in the automobile, the engine of which had been started. The former had the blackjack in her handbag and the latter had the brass knuckles in his pocket, which articles they told the officers they had taken from the Graydons. A woman who lived in the neighborhood had searched the automobile, but found no weapon nor ammunition of any kind. Another witness testified that a short time later Doane went to the automobile. Following this, the police searched the car and found several cartridges under the floor mat. Bowers' son testified that the previous Sunday he heard his father say to appellant, with reference to Graydon, that "his hours are numbered," that appellant had said Graydon would "get his," and that on that occasion Bowers had a blue revolver in his possession. Another son of Bowers testified that several years prior to the trial Bowers had kept a pair of brass knuckles. It may be observed that of those present the disinterested witnesses testified in favor of the prosecution, and that there was no altercation until Bowers and appellant appeared.

It is inconceivable to me that a slip in the instructions as to the measure of proof, involving a distinction which even those learned in the law might fail to notice when stated in the course of a long charge, contributed to the verdict. The jury undoubtedly concluded that appellant and Bowers were vicious meddlers who injected themselves into the legal dispute between Graydon and Doane. I think that what was said by the district court of appeal in the case of the codefendant Bowers (*People* v. *Bowers,* 56 Cal. App. 80 [204 Pac. 548]), concerning the part he and appellant played in the controversy between Graydon and the

Doanes, is equally justified by the record in this case. That opinion says: "Both Bowers and Maybelle Roe, and especially the latter, seem from the evidence to have adopted the Doane-Graydon controversy as personal to themselves. So far as can be learned from any of the evidence, neither Bowers nor Maybelle Roe had any interest whatsoever in the Doane house or any lease made by Mrs. Doane. . . . It was appellant's statement given at the trial that on the day of the affray he took Maybelle Roe with him because she was not feeling well and needed fresh air. Subsequent developments showed that for a person in enfeebled health Maybelle Roe was capable of great physical activity, for on the occasion of this second controversy which resulted fatally to Graydon, her participation therein was of the more deadly consequence. That she and appellant Bowers acted with mutual intent and like purpose no reasoning mind can doubt upon examination of the record here exhibited, and by that record it is shown plainly enough that had it not been for the presence and acts of Bowers and Maybelle Roe the controversy between the Doanes and Graydons as to the possession of the house would have been settled in a peaceful way, unaccompanied by the tragedy which occurred."

The jury passed on the respective stories concerning the tragedy, and in view of the verdict of murder in the first degree it must be presumed they accepted the version of the witnesses for the prosecution. Upon this hypothesis the jury must necessarily have concluded that a foul murder had been committed and utterly rejected the claim of the defense that appellant killed Graydon in order to save Bowers' life. Clearly, it was either a deliberate murder or a justifiable homicide. Indeed, as pointed out in the opinion of the district court of appeal herein, the testimony of appellant herself as to her purpose in firing the shot was equivocal to say the least. I quote: "While asserting on direct examination that she committed the act in defense of Bowers, she on cross-examination, in response to the question, 'Well, why did you fire the shot?' stated: 'Because he was killing Mr. Bowers.' And in reply to the question, 'Because who was killing Mr. Bowers?' answered, 'Mr. Graydon.' In response to further questions by the district attorney, she stated: 'I don't know why I fired it. No, I did not fire it at Mr. Graydon; I never fired it at Mr. Graydon.'" In view of the

verdict, the jury could have given no credence to the story of the defense that with Bowers standing over Graydon, Doane struggling against him, and appellant standing close by armed and ready to intervene, that Graydon was able to throw Bowers to the ground and succeed in choking him by pulling at his necktie. It is plain to me that the jury regarded this as a fabricated defense; that they believed there was absolutely no occasion for killing Graydon, but that the killing was a part of the original conspiracy against him. Upon no hypothesis should it be held that the testimony of the defense was of sufficient weight to have created a reasonable doubt in the minds of the jury as to the guilt of appellant even though they had been properly instructed on the measure of proof. In other words, it could have made no difference to the jury, even if they observed the distinction between the terms "preponderance of the evidence" and "sufficient to raise a reasonable doubt," which one was used. In my opinion it is improbable that the verdict was affected by any nice question of the *quantum* of proof, but that the jury concluded the entire defense was destitute of merit. I can hardly believe that the jury was so undecided as to the effect of the evidence that if the rule had been correctly stated to them they would have held appellant guiltless. This is the second jury that has accepted the theory of the prosecution, and in my opinion no other jury would reach a different conclusion on the evidence. The judgment should be affirmed.

Rehearing denied.

All the Justices present concurred, except Lawlor, J., who dissented.

Richards, J., *pro tem.,* was acting.