[Crim. No. 1725.  In Bank.—March 5, 1913.]

## THE PEOPLE, Respondent, v. W. J. O'BRYAN, Appellant.

CRIMINAL LAW—MURDER OF NONUNION WORKMAN BY UNION STRIKER—EVIDENCE SHOWING MOTIVE.—On the trial of a member of a labor union, that was conducting a strike against a manufacturing corporation, for the murder of a nonunion employee of the latter, the prosecution, for the purpose of showing a motive for the killing, may prove the existence of the strike, the connection of the defendant with the organization conducting it, and the employment of the deceased as a nonunion workman by the corporation. The evidence in that connection should be limited to a general showing of the relation of the parties.

ID.—EVIDENCE OF CONTEMPORANEOUS ASSAULT ON OTHER NONUNION WORKMAN.—In such prosecution, the fact that the defendant, immediately following the firing of the shot that killed the deceased, made an assault upon a person who was then accompanying him, and who was also a nonunion employee of the corporation, was admissible in evidence for the purpose of showing the motive and intent of the defendant.

ID.—EVIDENCE OF SEPARATE OFFENSES WHERE ADMISSIBLE.—Where two offenses are part of a single transaction, every element of defendant's conduct in that transaction can be shown to the jury for the purpose of illustrating his motive and intent in committing the act which was the basis of the charge against him.

ID.—DEFENDANT WITNESS IN OWN BEHALF—CROSS-EXAMINATION TO SHOW INTENT TO KILL.—Where the defendant in such prosecution, as a witness in his own behalf, testified on his direct examination, that he had never seen the deceased and his companion before the night of the shooting, and that he shot his gun without aiming at and without intending to kill him, and merely to scare him and to make him stop while he was running away, it was proper, on cross-examination, to ask the defendant any questions so framed as to elicit answers which might tend to show that he had in fact entertained and acted upon the purpose of killing or injuring the deceased.

ID.—RELATION OF DEFENDANT TO UNION CONDUCTING STRIKE—IMPEACHMENT.—In such connection it was permissible to cross-examine the defendant upon his relation to the strike as an "organizer" for the union, and as to his movements on the night of the homicide, and to draw out his statements of the occurrences leading up to the shooting. If, in any of his answers, he testified in such manner as to lend support to his declaration made on direct examination, that he had not intended to shoot the deceased, the prosecution

was not bound by such answers, but had the right to impeach him by proof of contradictory statements made at other times.

ID.—STATEMENTS MADE BY DEFENDANT BEFORE GRAND JURY AFTER ARREST—INVOLUNTARY STATEMENTS—EVIDENCE OF STATEMENTS INADMISSIBLE—CONSTITUTIONAL LAW.—Where the defendant, after being arrested on suspicion of being concerned in the killing, and while he was held in custody in the county jail, but before any formal charge had been made against him, was taken into the presence of the grand jury by the sheriff, and was sworn and examined by that body concerning his actions before and at the time of the shooting, without being informed of his constitutional right to decline to be a witness against himself, nor warned that his statements might be used against him, it cannot be said that his submission to the interrogation was in any fair sense voluntary, and the testimony so given by him cannot be used against him. The admission of such testimony is in violation of the constitutional right of every person, secured by article I, sec. 13, of the state constitution, not to "be compelled, in any criminal case, to be a witness against himself."

ID.—DEFENDANT TRIED UPON INFORMATION.—It is immaterial on the question of the admissibility of the testimony so elicited, that the grand jury did not return an indictment, and that the defendant was in fact tried upon an information.

ID.—CONSTRUCTION OF SECTION 4½ OF ARTICLE VI OF CONSTITUTION—REVIEW OF EVIDENCE ON APPEAL—ERROR IN ADMITTING EVIDENCE NOT A MISCARRIAGE OF JUSTICE.—It is held, by Sloss, J., Angellotti, J., and Shaw, J., that in view of the terms of section 4½ of article VI, added to the constitution by amendment in 1911, and providing that "no judgment shall be set aside, or new trial granted in any criminal case on the ground of misdirection of the jury or the improper admission or rejection of evidence, or for error in any matter of pleading or procedure, unless after an examination of the entire cause including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice," and upon a consideration of the entire case, including the evidence, the error in the admission of the testimony so given by the defendant before the grand jury, cannot be said to have resulted in a miscarriage of justice, and that it did not warrant a reversal.

ID.—ABROGATION OF RULE PRESUMING PREJUDICE FROM ERROR OF LAW—EFFECT OF SECTION ON CONSTITUTIONAL RIGHTS OF DEFENDANT.—It is also held, by Sloss, J., Angelotti, J., and Shaw, J., that section 4½ of article VI of the constitution must be given at least the effect of abrogating the old rule that prejudice is presumed from any error of law, and that where error is shown it is the duty of the court to examine the evidence and ascertain from such examination whether the error did or did not in fact work any injury, and that

the mere fact of error does not make out a *prima facie* case for reversal which must be overcome by a clear showing that no injury could have resulted. It is further held, that the section was not designed to repeal or abrogate the guaranties accorded persons accused of crime by other parts of the constitution, or to overthrow all statutory rules of procedure and evidence in criminal cases, but that every invasion of even a constitutional right does not necessarily require a reversal.

ID.—SECTION APPLICABLE TO OFFENSES COMMITTED PRIOR TO ITS ADOPTION—EX POST FACTO LAWS.—It is further held, by Sloss, J., Angellotti, J., and Shaw, J., that section 4½ of article VI, as so construed, is applicable to offenses committed prior to its adoption, and is not obnoxious to the provision of the federal constitution against *ex post facto* laws, as it does not affect the crime with which the defendant was charged, the punishment prescribed therefor, or the quantity or degree of proof necessary to establish his guilt, but merely alters the rules for the disposition of an appeal after trial. Such a change is permissible on the ground that it merely goes to matters of remedy or procedure.

ID.—ERROR IN ADMITTING EVIDENCE CURED BY TESTIMONY OF DEFENDANT. It is held by Lorigan, J., Melvin, J., and Henshaw, J., that the present case does not require a construction of section 4½ of article VI of the constitution and its application under the evidence, for the reason that the error in admitting in evidence the statements made by the defendant before the grand jury was cured by testimony to substantially the same effect that was given by the defendant while a witness in his own behalf.

APPEAL from a judgment of the Superior Court of San Luis Obispo County and from an order refusing a new trial. E. B. Unangst, Judge.

The facts are stated in the opinion of the court.

A. E. Campbell, and George Appell, for Appellant.

U. S. Webb, Attorney-General, and George Beebe, Deputy Attorney-General, for Respondent.

SLOSS, J.—The defendant, convicted of murder of the first degree and sentenced to life imprisonment, appeals from the judgment and from an order denying his motion for a new trial.

The appellant does not question the sufficiency of the evidence to support the verdict, nor does he attack the instruc-

tions given to the jury. The only errors assigned consist of certain rulings admitting evidence over the objection of the defendant. A brief statement of the case presented by the people will suffice for the understanding of the points so raised.

Defendant was a member of a labor organization which had declared a strike against certain employers, including the Llewellyn Iron Works. John D. Avila, the deceased, and one Molina, were nonunion workmen and were working for the Llewellyn Iron Works in the construction of oil tanks near the city of San Luis Obispo. Early in the morning of December 17, 1910, Avila and Molina, after spending the preceding evening in the city, started to walk back to their lodgings, which were at the place where the tanks were being erected. After they had gone some distance, they were overtaken by the defendant, who, with two companions, was following them. The defendant was armed with a revolver. Avila drew a pistol, but the defendant came up to him and seized him by the wrist of his pistol hand. One of the men with O'Bryan then took Avila's pistol from him. A similar weapon was also taken from Molina.

Avila broke away from O'Bryan and started to run toward the city. O'Bryan ordered him to stop, and, on Avila disregarding the command, fired. Avila continued to run, and made his way to the city. It appears, however, that the bullet from defendant's revolver had passed through his body, and in consequence of the wound so received, he died during the following night. O'Bryan did not pursue him, but turned to Molina, and, after asking him questions regarding his and Avila's employment, struck him. Molina then ran away and made his escape.

While it was not expressly admitted that the shot fired by O'Bryan had caused Avila's death, there was no real controversy over this point. The defendant's contention was that he had fired for the purpose, merely, of frightening Avila, and without any intention of hitting him. It is apparent, therefore, that the intent of the defendant became the paramount issue, and that any competent testimony tending to show a motive on his part for the killing or injuring of Avila, or to throw light on the purpose leading him to fire the fatal shot, was relevant and proper.

It cannot be doubted that the prosecution was entirely within its rights in proving the existence of the strike, the connection of the defendant with the organization conducting the strike, and the employment of Avila as a nonunion workman by the Llewellyn Iron Works, one of the employers against whom the strike was directed. This was evidence tending very directly to show a motive on O'Bryan's part for attacking Avila. (*People* v. *Grow,* 16 Cal. App. 147, [116 Pac. 369] ; *People* v. *Donnelly,* 143 Cal. 394, [77 Pac. 177] ; *People* v. *Soeder,* 150 Cal. 12, [87 Pac. 1016].) It may be observed, however, that testimony of this character should be limited to a general showing of the relations of the parties. (*People* v. *Thompson,* 92 Cal. 506, 512, [28 Pac. 589] ; *People* v. *Colvin,* 118 Cal. 349, [50 Pac. 539].) Perhaps the district attorney was permitted, in this case, to show with too great detail the activities of the defendant on behalf of the union. At the same time, we cannot see that anything substantially prejudicial to the defendant was elicited in consequence of the widening of the range of inquiry.

There was no error in permitting the people to prove the assault upon Molina, following the firing of the shot that killed Avila. The general rule is, of course, that evidence of offenses other than the one for which the defendant is on trial, is not admissible. But where the two offenses are part of a single transaction, ''every element of defendant's conduct in that transaction could be shown to the jury for the purpose of illustrating his motive and intent in committing the act which was the basis of the charge against him.'' (*People* v. *Manasse,* 153 Cal. 10, [94 Pac. 92] ; *People* v. *Walters,* 98 Cal. 141, [32 Pac. 864] ; *People* v. *Craig,* 111 Cal. 468, [44 Pac. 186; *People* v. *Teixeira,* 123 Cal. 298, [55 Pac. 988] ; *People* v. *Suesser,* 142 Cal. 363, [75 Pac. 1093].) It was the theory of the prosecution—and the theory was entirely reasonable under the evidence—that the shooting of Avila and the assault on Molina were parts of one attack upon the two, perpetrated in pursuance of a single scheme to terrorize or injure them because they were working for the Llewellyn Iron Works. Whatever was done in the course of that attack was proper as throwing light on the motive and intent of O'Bryan and his companions.

The defendant took the stand as a witness in his own behalf. His testimony on direct examination, was, in effect, that he saw Molina and Avila on the night of the shooting, that he had never seen them before, that he shot his gun, that he did not shoot at or aim at Avila, and did not intend to kill him. His purpose, he testified, was to scare Avila, and to make him stop.

The cross-examination of the defendant was extended, but with an exception to which we shall recur, we cannot see that it exceeded the proper limits of cross-examination. By asserting that he had not intended to shoot Avila, the defendant opened the door to any questions so framed as to elicit answers which might tend to show that he had in fact entertained and acted upon the purpose of killing or injuring Avila. In seeking to obtain answers which would support the claim that the defendant was actuated by a motive of hostility to Avila, the prosecution did not go beyond the bounds defined in section 1323 of the Penal Code, which permits a defendant offering himself as a witness to be cross-examined "as to all matters about which he was examined in chief." In so far as the cross-examination touched upon O'Bryan's relation to the strike as an "organizer" for the union, it is apparent, from what we have already said, that the questions had a proper bearing upon his motive and intent. It was entirely permissible, too, for the prosecution to go into the defendant's movements on the night of the homicide, and to draw out his statement of the occurrences leading up to the shooting. If, in any of his answers, he testified in such manner as to lend support to his declaration made on direct examination, that he had not intended to shoot the deceased, the prosecution was not bound by such answers, but had the right to impeach him by proof of contradictory statements made at other times. Evidence directed to this end did not violate the rule prohibiting impeachment on matters "collateral and irrelevant to the issue." Without discussing in detail the various questions asked of defendant in the course of a somewhat protracted cross-examination, we may say that the rulings of the court in this regard were, in the main, correct, and that any errors that may have been committed were of trivial import.

On the day of the shooting, December 18th, the defendant was arrested on suspicion of being concerned in the killing of

Avila, and was held in custody in the county jail. No formal charge had been made against him when, on the 28th of December, he was, by the sheriff, taken before the grand jury which was investigating the homicide, and was sworn and questioned concerning his actions before and at the time of the shooting. He was not informed of his constitutional right to decline to be a witness against himself, nor was he warned that his statements might be used against him. In response to the examination of the district attorney, he made to the grand jury a number of statements. These statements did not amount to a confession, but were admissible in evidence against the defendant as declarations against interest, unless proof of them was rendered incompetent by the manner in which they had been obtained.

Over the objection of the defendant, the people were allowed to show the questions thus asked of O'Bryan before the grand jury and his answers thereto.

This testimony should not have been admitted. The course pursued was in violation of the constitutional right of every person not to "be compelled, in any criminal case, to be a witness against himself." (Const. Cal., art. I, sec. 13.) The defendant could not, of course, have been called and required to testify against himself at the trial. The guarantee against being so compelled would be of little value if the same result could be attained by the indirect method of compelling him to testify at some antecedent step of the proceedings against him and then offering in evidence his statements so extracted. We do not mean to suggest that under no circumstances can testimony given by a person before a grand jury be given in evidence in a subsequent trial of a criminal charge against him. The constitution protects a person from being *compelled* to be a witness *against himself*. If, at the time he appears, no accusation, formal or informal, has been made against him, he does not, in testifying, become a witness against himself. Or if, even though charged with crime, he voluntarily gives evidence against himself, his rights are not infringed by the use of such evidence thereafter. These distinctions are well illustrated by a series of New York cases (*Hendrickson* v. *People*, 10 N. Y. 13, [61 Am. Dec. 721; *People* v. *McMahon*, 15 N. Y. 384; *Teachout* v. *People*, 41 N. Y. 7; *People* v. *Singer*, 18 Abb. N. C. (N. Y.) 96; *People* v.

*Mondon,* 103 N. Y. 211, [57 Am. Rep. 709, 8 N. E. 496]; *People* v. *Chapleau,* 121 N. Y. 267, [24 N. E. 469]), the result of which is summed up in *People* v. *Molineaux,* 168 N. Y. 331, [62 L. R. A. 193, 61 N. E. 308], in these words: "When a person testified at an inquest as an accused or arrested party, his testimony cannot be used against him upon a subsequent trial of an indictment growing out of the inquest, unless his testimony has been *voluntarily* given after he has been fully advised of his rights and has been given an opportunity to avail himself of them."

Here the defendant, when brought before the grand jury, was in custody under an accusation of guilt of the crime under investigation. Taken into the presence of that body by the sheriff, sworn and examined without the aid of counsel, and without any instruction as to his rights, it cannot be said that his submission to the interrogation was in any fair sense voluntary. The great preponderance of authority is that testimony so given by a defendant is not to be used against him. (*United States* v. *Kimball,* 117 Fed. 156, 163; *Boone* v. *People,* 148 Ill. 440, [36 N. E. 99]; *State* v. *Clifford,* 86 Iowa, 550, [41 Am. St. Rep. 518, 53 N. W. 299]; *State* v. *Froiseth,* 16 Minn. (296) 260.)

Of the cases cited to support the admission of this testimony, the only one which need be noticed is *People* v. *Sexton,* 132 Cal. 37, [64 Pac. 107], in which this court used the following language: "Defendant's statements, whether made in the grand jury room, at the trial, or extrajudicially, may be used against him, and we see no error in their admission here." The report of the decision does not disclose the conditions under which the defendant in the Sexton case testified before the grand jury. It may well be assumed that no accusation had been made against Sexton, or that he gave his testimony voluntarily, with full knowledge of his right to remain silent. In either of these events his declarations were properly admitted in evidence at the trial. At any rate, we cannot regard the case as an authority requiring us to hold that the state may give in evidence against a defendant charged with a criminal offense testimony which he, while accused of the same offense, was compelled to give before a grand jury investigating such offense.

We attach no importance whatever to the circumstance that the grand jury did not return an indictment, and that the defendant was in fact tried upon an information. Granting that the testimony given by him before the grand jury could not be used against him on the trial of an indictment found by that body, it would be manifestly unfair to hold that the constitutional right was lost because the district attorney elected to proceed by information rather than indictment. To so hold would give sanction to a device which might readily be used for the purpose of accomplishing by evasion what could not be done directly.

For like reasons, it was improper to permit the district attorney, on cross-examination of the defendant, to question him concerning other statements similarly made by him before the grand jury.

But, conceding that error was committed in the admission of this testimony, there still remains the question whether the character and effect of the error were such as to require a reversal. This question must be answered with due regard to the terms of section 4½ of article VI, added to the constitution by amendment adopted in 1911. Section 4½ reads as follows: "No judgment shall be set aside, or new trial granted in any criminal case on the ground of misdirection of the jury or the improper admission or rejection of evidence, or for error in any matter of pleading or procedure, unless after an examination of the entire cause including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." The general purpose of the amendment is plain. Inasmuch as under the pre-existing provisions of the constitution the jurisdiction of the supreme court and of the district courts of appeal was limited in criminal cases "to questions of law alone" (Const., art. VI, sec. 4) it was incumbent upon these courts to reverse any judgment of conviction based upon proceedings which were affected in any degree by substantial error of law. Where, however, the error complained of was trivial or the record showed that no prejudice to a substantial right could have resulted therefrom to the defendant, it has always, even before the amendment, been the practice to disregard the error. (Pen. Code, sec. 1258.) But where neither of these conditions existed and the error was one

which might or might not have turned the scale against the defendant, the limitation of the appellate jurisdiction to questions of law precluded the reviewing courts from weighing the evidence for the purpose of forming an opinion whether the error had or had not in fact worked injury. Having no jurisdiction in matters of fact, the court in which the appeal was pending was bound to apply the doctrine that prejudice was presumed to follow from substantial error.

In not a few instances this limitation upon the power of courts produced results which were unsatisfactory and which seemed to hamper the state in its efforts for a prompt and effective enforcement of the prohibitions and penalties of its penal laws. It sometimes became necessary for the courts of appeal and for this court to grant new trials to defendants on account of technical errors or omissions, even though a review of the evidence, if such review could legally have been undertaken, would have shown that the guilt of the accused had been established beyond question and by means of a procedure which was substantially fair and just. It was to avoid the necessity for such results that the amendment in question was proposed and adopted. By the new constitutional provision the appellate courts are empowered to examine "the entire cause, *including the evidence*" and are required to affirm the judgment, notwithstanding error, if error has not resulted "in a miscarriage of justice." What, then, is a miscarriage of justice? The phrase is a general one and has not as yet acquired a precise meaning. We find it in the English Criminal Appeal Act of 1907 (7 Edw. VII, c. 23), section 4 of which contains this language: "provided that the court may, notwithstanding they are of opinion that the point raised on the appeal might be decided in favor of the appellant, dismiss the appeal if they consider that no substantial miscarriage of justice has actually occurred." The court of criminal appeal created by this act has had frequent occasion to consider whether a given error has resulted in a miscarriage of justice. In the case of *Peter Meyer*, 1. Crim. App. Cas. 10, 12, the Lord Chief Justice said that the provision "enables the court to go behind technical slips and do substantial justice." We have no doubt that in a general way this fairly states the purpose of our own constitutional provision. It does not, however, afford an all-embracing test

or definition for determining just what will constitute a miscarriage of justice. In the case of *Cohen and Bateman*, 2 Crim. App. Cas. 197–207, Channell, J., referring to section 4 of the Criminal Appeal Act, used this language: "This section has been considered in almost all the cases which have come before this court, but these precedents are of little use in subsequent cases because of the varying circumstances of each particular case." The same may be said of our constitutional provision. It is as difficult to frame a definition of "miscarriage of justice" which shall be "at once perspicuous, comprehensive and satisfactory" as it has been to thus define the term "due process of law" of which Mr. Justice Miller said, in *Davidson* v. *New Orleans*, 96 U. S. 97, 104, [24 L. Ed. 616] : "There is wisdom in the ascertaining of the intent and application of such an important phrase in the federal constitution, by the gradual process of judicial inclusion and exclusion, as the cases presented for decision shall require, with the reasoning on which such decisions may be founded."

This much, however, we think may be safely said. Section 4½ of article VI of our constitution must be given at least the effect of abrogating the old rule that prejudice is presumed from any error of law. Where error is shown it is the duty of the court to examine the evidence and ascertain from such examination whether the error did or did not in fact work any injury. The mere fact of error does not make out a *prima facie* case for reversal which must be overcome by a clear showing that no injury could have resulted.

On the other hand, we do not understand that the amendment in question was designed to repeal or abrogate the guaranties accorded persons accused of crime by other parts of the same constitution or to overthrow all statutory rules of procedure and evidence in criminal cases. When we speak of administering "justice" in criminal cases, under the English or American system of procedure, we mean something more than merely ascertaining whether an accused is or is not guilty. It is an essential part of justice that the question of guilt or innocence shall be determined by an orderly legal procedure, in which the substantial rights belonging to defendants shall be respected. For example, if a court should undertake to deny to a defendant charged with a fel-

CLXV Cal.—5

ony the right of trial by jury, and after a hearing of the evidence render a judgment of conviction, it cannot be doubted that such judgment should be set aside even though there had been the clearest proof of guilt. Or, if a defendant, after having been once acquitted, should be again brought to trial and thereupon convicted, in disregard of his plea that he had been once in jeopardy, it would hardly be suggested that because he was in fact guilty, no "miscarriage of justice" had occurred.

But it does not follow that every invasion of even a constitutional right necessarily requires a reversal. It may well be that the court, after examining the "entire cause including the evidence," is of the opinion that the error complained of, whatever its character, has not resulted in a miscarriage of justice. The mere fact that the assignment of error is based upon a provision of the constitution is not conclusive. The final test is the opinion of the appellate court upon the result of the error. No doubt this view requires the court, to some extent, to weigh the evidence, and form conclusions upon its weight—a function which, heretofore, has been reserved for the jury. But it cannot be doubted that the legislators, in proposing the amendment, and the electors, in adopting it, intended to put upon the courts the performance of just that function. We are not substituted for the jury. We are not to determine, as an original inquiry, the question of the defendant's guilt or innocence. But, where the jury has found him guilty, we must, upon a review of the entire record, decide whether, in our judgment, any error committed has led to the verdict which was reached. If it appears to our satisfaction that the result was just, and that it would have been reached if the error had not been committed, a new trial is not to be ordered.

The application of these views requires an affirmance of the judgment and order under review, notwithstanding our conclusion, as already stated, that the statements of the appellant to the grand jury should not have been allowed to go to the jury. These statements were to the effect that the defendant had joined the union at Coalinga in August; that he had quit work on account of the strike, and thereafter had drawn strike benefits of seven dollars a week, that, after coming to San Luis Obispo, he had acted as captain of the organizers;

that he went out to see that the organizers were doing their
duty, which was to get the men working at the Tank Farm
to join the union, if possible. These declarations were intro-
duced as a part of the people's case in chief. Every material
matter covered by them was shown to the jury by other evi-
dence, which was concededly admissible, and the truth of
which was not contradicted. Among other things, it was
proven that substantially the same statements had been made
by the defendant in interviews with the district attorney. In
his testimony at the trial, in response to proper cross-exami-
nation, he again reiterated the substance of these declara-
tions. In this state of the record, we should certainly not
be justified in forming or expressing the opinion that the ad-
mission of this testimony had resulted in a miscarriage of jus-
tice.

As we have already stated, O'Bryan was cross-examined
regarding other statements made to the grand jury, and such
statements were introduced in evidence on rebuttal. Nothing
of any consequence was developed in this way, with the ex-
ception of testimony of the defendant's statement that he
had, before going down the road on the night of the shooting,
obtained a loaded pistol from the union headquarters. The
only importance of this declaration was that it differed from
his testimony at the trial, in which he stated that he did not
know, when he got the pistol or when he came up to Avila
and Molina, whether or not the pistol was loaded. In view
of the testimony regarding defendant's conduct, including
his own admissions before and at the trial, this statement was
so improbable that we cannot, without reflecting upon the
common sense of the jury, assume that credence could have
been given to it. Any fair-minded man must have believed
that O'Bryan knew that his pistol was loaded, and the admis-
sion of his own declaration to that effect was not, therefore,
an error for which, under the constitutional provision above
quoted, a new trial should be granted.

The offense with which the appellant was charged was com-
mitted prior to the adoption of section 4½ of article VI. But
the amendment, under the construction which we have given
to it, is not obnoxious to the provision of the federal consti-
tution against *ex post facto* laws. It does not affect the crime
with which the defendant was charged, "the punishment pre-

scribed therefor, or the quantity or degree of proof necessary
to establish his guilt.'' (*Mallett* v. *North Carolina,* 181 U. S.
589, [45 L. Ed. 1015, 21 Sup. Ct. Rep. 730].) It merely alters
the rules for the disposition of an appeal after trial. There
can be no constitutional objection to an enactment which,
while it preserves to a defendant all the substantial safeguards
in force at the time of the commission of the act charged,
merely provides that formal or technical errors, which have
not brought about an unjust result, shall not be ground for
a reversal. (*Jacquins* v. *Commonwealth,* 9 Cush. (Mass.)
279.) There is no vested right to have a judgment set aside
for errors which have not affected the real merits of the cause.
Such changes as the one under consideration are permissible
on the ground that they go merely to matters of remedy or
procedure. In the case last cited, the court applied to past
judgments a statute providing that where a criminal judg-
ment is reversed upon writ of error on account of error in
the sentence, the court may render such judgment as should
have been rendered, or may remand the case for that purpose.
Shaw, C. J., delivering the opinion of the court, used the
following language, which is very appropriate here: ''It was
competent for the legislature to take away writs of error
altogether, in cases where the irregularities are formal and
technical only, and to provide that no judgment should be
reversed for such cause.'' Similarly, in *Mallett* v. *North Car-
olina,* 181 U. S. 589, [45 L. Ed. 1015, 21 Sup. Ct. Rep. 730],
the supreme court of the United States upheld, as applied to
past offenses, a statute which gave to the prosecution an ap-
peal where none had before been allowed.

The judgment and the order denying a new trial are af-
firmed.

Angellotti, J., and Shaw, J., concurred.

LORIGAN, J., concurring.—I concur in the judgment and
order of affirmance in this case and in the views expressed
by Mr. Justice Sloss in the foregoing opinion except as to
the construction of section 4½ of article VI of the constitution
and its application under the evidence. I am of the opinion
that neither the construction nor application of this section
is necessarily involved in the disposition of this appeal, and,
therefore, the discussion upon it is *obiter* and the scope of

the section may be better left until the question is squarely presented. It was, as pointed out in the opinion, error for the court to have admitted in evidence on behalf of the state the statements made by the defendant before the grand jury. This was in violation of the constitutional right of the defendant not to "be compelled in any criminal case to be a witness against himself." If the defendant had not subsequently become a witness on the trial in his own behalf but had stood squarely upon the error of the court in permitting evidence of those statements, I am not prepared just now to say that against this violation of a constitutional right the section of the constitution could be interposed. But here the defendant did not stand upon the error. He became subsequent to its admission a witness in his own behalf and gave testimony in chief upon such matters as warranted the district attorney upon cross-examination in covering all the matters concerning which he had made statements before the grand jury. This district attorney was justified in cross-examining him as to all these matters and the testimony of the defendant respecting them was substantially a reiteration of the statements he had made before the grand jury. This being true, whatever error was committed by the court in the first instance was cured by this subsequently properly elicited testimony covering the same matters. The original prejudicial character as error was obviated by this subsequent confirmatory evidence of the defendant and under the general rule which has always obtained here the error became harmless and could not be successfully invoked by defendant to obtain a reversal. This being the general rule applied before the constitutional amendment referred to was made, it is as directly applicable now since the amendment, and the assignment of the ruling as error was without merit by virtue of the general rule and in my opinion, therefore, it is unnecessary *obiter* to construe or apply the amendment in disposing of this alleged error. The general rule to which we have thus referred is one to which this court long since has given succinct utterance. Thus in *People* v. *Brotherton,* 47 Cal. 388, 404, where the question before this court was the ruling of the trial court upon a matter of evidence, it is said: "That a technical error has intervened at the trial is, therefore, not of itself enough to warrant our interference. The prisoners must go further,

and affirmatively show in some way that their substantial rights have been injuriously affected by the error complained of.'' That the principle here laid down has since been consistently adhered to and never once departed from will appear from the following cases in each one of which it was argued on behalf of the defendant that error prejudicial to him arose under the court's rulings receiving or rejecting evidence, and in each one of which this court refused to support the contention: *People* v. *Barnhart,* 59 Cal. 381; *People* v. *Chuck,* 78 Cal. 317, [20 Pac. 719] ; *People* v. *Nelson,* 85 Cal. 425, [24 Pac. 1006] ; *People* v. *Daniels,* 105 Cal. 262, [38 Pac. 720] ; *People* v. *Clark,* 106 Cal. 33, [39 Pac. 53] ; *People* v. *Maroney,* 109 Cal. 278, [41 Pac. 1097] ; *People* v. *Barthleman,* 120 Cal. 15, [52 Pac. 112] ; *People* v. *Wynn,* 133 Cal. 72, [65 Pac. 126] ; *People* v. *Glaze,* 139 Cal. 162, [72 Pac. 965].

Melvin, J., and Henshaw, J., concurred.