[Civ. No. 3382. Third Appellate District.—December 19, 1927.]

VIOLA HOUGHTON, Respondent, v. PICKWICK STAGES, NORTHERN DIVISION (a Corporation), Appellant.

W. I. Gilbert, B. P. Gibbs, and Sarau & Thompson for Appellant.

Culbert L. Olson for Respondent.

PLUMMER, J.—The plaintiff had judgment against the defendant in the sum of $10,000 for personal injuries suffered in a collision between a Ford coupe in which the plaintiff was riding and one of the stages belonging to the defendant. No question is presented as to the amount of damages. The record shows that the plaintiff was seriously injured and left a cripple for life. The facts disclosed by the testimony are as follows: On the twenty-first day of April, 1924, the plaintiff was riding in a Ford coupe with Thomas E. Bradley and Mrs. Eleanor Bradley. The Ford coupe had but one seat and all three persons just named were seated thereon, the plaintiff being to the right. The Ford coupe was owned by Mr. Bradley and was being driven in a westerly direction on that certain street known as and called Industrial Street in the city of Los Angeles. At approximately the same time a stage belonging to the defendant corporation was being driven in a southerly direction on a certain other street in the city of Los Angeles known as and called Mill Street, the two streets just named intersecting each other. The collision occurred at a point approximately ten feet westerly of the center of the intersection of said streets.

At the time of the collision herein referred to, section 131 of the Motor Vehicle Act, as amended in 1923, read as follows: "A vehicle entering an intersection of public highways, at a lawful speed, shall have the right of way over a vehicle approaching from its left, unless such vehicle

approaching from the left shall have first entered into such intersection at a lawful speed, in which event the vehicle on the left shall have the right of way.'' The testimony of the plaintiff and of the two other persons occupying the Ford coupe was to the effect that the Ford was being driven at a speed of about twelve miles per hour; that when the Ford coupe entered the intersection of Industrial Street and Mill Street the stage was several feet north of the north line of the intersection; that as the Ford continued on westerly across the intersection to a point west of said intersection, the stage traveling at a speed of about thirty miles per hour, came into the intersection and smashed into the Ford coupe before the driver of the coupe could do anything to avoid a collision. The front part of the stage struck the right-hand side of the coupe on which the plaintiff was sitting, breaking the door and generally smashing the entire right-hand side of the coupe. The complaint and the testimony set forth the injuries suffered by the plaintiff, but as no point is made as to the damages, a recital of plaintiff's injuries is omitted. The momentum of the stage carried the coupe to a point south of the south line of Industrial Street, and there came to a stop. On the part of the defendant the bus driver testified that the stage traveling at about fifteen miles per hour first entered the intersection; that at the time the stage entered the intersection the Ford coupe was at a point from twenty to twenty-five feet east of the east line of Mill Street, and was traveling at a speed of between twenty-five and thirty miles per hour. That as the coupe came westerly across the intersection, the wheels of the coupe ran on both sides of the "button" in the center of the intersection, or, as witnesses described it, the coupe straddled the button and that at a point just west of the intersection the Ford coupe was turned quickly to the left as if to avoid a collision, and that the Ford toppled over upon the hood, bumper, and left fender of the stage.

The wrecked Ford was taken into the possession of the defendant immediately following the accident, and to a garage maintained by it near the scene of the collision. It remained in this place for about two weeks, and then was removed to an open lot immediately adjoining a garage belonging to the defendant, where it remained until

it was placed upon a truck and hauled to the courthouse for purposes of inspection during the trial. It appears that the coupe was in plain view of the defendant during all the time after the accident up to its removal to the courthouse, as just stated. The Ford was moved once about twenty feet in its storage place during the time between the accident and the date of its inspection at the trial, and also was loaded upon a truck and taken to the courthouse for inspection, as above stated. It appears that the left rear wheel, the spokes of which were broken, was removed from it either during the time it was in the defendant's yard or in the storage yard, and other wheels which did not belong to the car were put on it to hold it up. What was left of the right-hand door, which at one time was lying inside the car where it had been driven by the collision, was missing. Some other little changes as to the lining of the car appear also to have taken place. Testimony was introduced by the parties as to the condition of the Ford coupe immediately after the collision, and also as to the changes that had been made in its condition. After all this had been done and after the defendant had introduced considerable testimony as to the condition of the car and photographed as to its condition, the court permitted an inspection of the coupe.

The assignments of error presented for our consideration are two in number; first, that the court erred in permitting the jury to view the Ford coupe; second, that the court erred in instructing the jury that the bus driver and the employees of the defendant were interested witnesses, etc. The objection that the court erred in permitting an inspection of the coupe is based upon the theory of the defendant that the Ford coupe, by reason of the driver having turned sharply to the left, was caused to topple over upon the front of the Pickwick stage, and that the stage did not run into the Ford coupe, and that a certain indentation on the door of the Ford coupe substantiated their theory. No argument is presented upon said appeal that the jury was wrong in coming to the conclusion that the Ford coupe first entered the intersection, though the testimony of the defendant's two bus drivers is set forth in which they state the contrary. If the Ford coupe first entered the intersection, it had, under the provision of the Motor

Vehicle Law as that law existed at the time of the collision, the right of way across that intersection, and the driver of the Ford coupe had the right to assume that the driver of the bus would observe that law, and if, as stated by the defendant's witnesses, the driver of the Ford coupe, in order to avoid a direct or other collision with the stage, essayed a sharp, left-hand turn and thereby the Ford coupe was toppled over against the front of the stage, the responsibility of the defendant would be exactly the same as though the collision had been head-on. The fact that the driver of the coupe attempted to avoid the collision when he became aware of the fact that danger was impending and imminent, and that the bus driver had not regarded the law but was coming across the intersection at a rate of speed which indicated that the stage could not be stopped, does not lessen the defendant's liability in any particular. The whole argument, based upon the assumption that the coupe toppled over before it was hit by the bus, is absolutely without any merit whatever if the premises are correct that the coupe first entered the intersection. ■ It therefore follows that no error on the part of the court could or can be predicated on the fact that an inspection of the Ford coupe was permitted. The fact that the bus hit the Ford or the Ford toppled against the bus had no bearing whatever upon the right of way. It did bear upon the question as to whether the driver of the Ford coupe endeavored, in a perilous situation, to avoid the collision, or at least to avoid a direct hit. During the course of the trial the defendant exhibited five photographs of the Ford coupe which we cannot produce in this opinion, but an inspection of which shows that after having been introduced and shown to the jury, an inspection of the car by the jury could not have had any effect whatever. The photographs to which we have referred show the Ford coupe to be almost a complete wreck. In fact, the defendant's exhibit No. 6, showing the side of the Ford coupe on which the plaintiff was riding, leaves just one question in the mind of the jury, and that is how anyone could be in that position and escape with his life. Photographs introduced as exhibits such as we have herein referred to, which can be appreciated only by an inspection, could leave no possible ground for any prejudice arising from

an inspection of the car, even though the parts thereof to which we have referred were missing.

■ The instruction, the giving of which is predicated as error, is as follows: "In weighing the evidence, you are to consider the credibility of witnesses who have testified before you. You are the sole and exclusive judges of their credibility. Their conduct, their character, as shown by the evidence; their manner on the stand; their relation to the parties, if any; their interest in the case; their bias and prejudice, if any; their degree of intelligence; the reasonableness or unreasonableness of their statements; and the strength or weakness of their recollection may be taken into consideration for the purpose of determining their credibility. This instruction, like all· instructions, applies not only to one side but to both sides. Attorneys refer to the interest of witnesses on the other side. *If there are interested witnesses or relatives* on the side of the plaintiff, you should consider that in determining their credibility, but you should not on that account solely, disbelieve their testimony. *On the other hand, the bus driver and the employees of the defendant were interested witnesses,* and the same rule applies to them, and only the same rule, that you should not on that account *alone* disbelieve their testimony, *but should consider their interest* in determining their credibility. A witness is presumed to speak the truth. This presumption, however, may be repelled by the manner in which the witness testifies, by the character of his testimony, his motives, or by contradictory evidence." The asserted prejudicial part of the instruction reads: "On the other hand, the bus-driver and the employees of the defendant were interested witnesses, and the same rule applies to them, and only the same rule, that you should not on that account alone, disbelieve their testimony, but should consider their interest in determining their credibility." The point is made that the court, in instructing the jury that the driver and employees of the defendant were interested witnesses, transgressed the exclusive province of the jury and instructed the jury upon a question of fact in contravention of section 19 of article VI of the constitution, which provides that: "Judges shall not charge juries with respect to matters of fact, but may state the testimony and declare the law." In support of this instruction the respondent cites,

first, the case of *Ellis* v. *Lakeshore & Michigan Southern R. R. Co.,* 138 Pa. 506 [21 Am. St. Rep. 914, 21 Atl. 140], where it was held that the trial court properly called attention to the fact that the engineer and fireman of the train were interested witnesses, although not affected pecuniarily by the verdict. The action involved damages suffered by the plaintiff at a railroad crossing.

In the case of *People* v. *Bush,* 71 Cal. 602 [12 Pac. 781], the following instruction was approved: "In this case Maude and Clara Parsons, nieces of the defendant, have been examined as witnesses in behalf of the defense. This is their right. It is proper, however, for the jury to bear in mind the relationship between them and the defendant, and the manner in which they may be interested by your verdict, and the very grave interest they must feel in it; and it is proper for the jury to consider whether their position and interest may not affect the credibility or color of their testimony."

In *Konig* v. *Lyon,* 49 Cal. App. 113 [192 Pac. 875], the following instruction was approved: "The plaintiff, as a matter of course, is interested in this case. You will simply consider that fact, and the same with the driver of the truck. He is interested on his side of the case, and you can consider it in determining his credibility." In this case, however, the jury was not told that the driver was interested in the case, but was interested in his side of the case. The case involved an automobile collision between a bicycle and a truck. It is also stipulated in that case that the driver of the truck was in the employ of the defendant, and it of course appeared that if he was negligent in the management and operation of the truck being driven by him at the time of the collision, the responsibility of his employer depended, as a matter of law, upon his responsibility, whether the truck driver was or was not made a party to the action.

In the case of *People* v. *Bernal,* 40 Cal. App. 358 [180 Pac. 825], cited as an authority supporting the instruction given to the jury in this case, the trial court instructed the jury that: "in judging the credibility of a witness, whether such witness be the defendant, the prosecutor or any other witness produced on either side, you may consider the interest and relation of such witness in and to

the case." To the same effect is the decision in the case of *People* v. *Amaya,* 134 Cal. 531 [66 Pac. 794]. As to the impropriety of giving such instructions, we may cite the case of *People* v. *Maughs,* 149 Cal. 253 [86 Pac. 187], where an instruction in this language was condemned: "Where the defendant offers himself as a witness in determining his credibility, it is proper to take into consideration the consequences, inducements and temptations which would ordinarily influence a person in his situation."

In *Huyck* v. *Rennie,* 151 Cal. 411 [90 Pac. 929], the court, with reference to such instructions, uses the following language: "It is unnecessary to cite authorities to the point that in this state where, under the constitutional provision, judges are prohibited from charging juries as to the facts, it is improper for the court in its instruction to select testimony of particular witnesses as entitled to special weight or consideration. Similarly, it is improper to indicate that less regard is to be paid to the testimony of one witness than to that of another."

That the trial court went beyond its province in instructing the jury that the employees of the defendant were interested witnesses seems to us very clear, but that does not, in and of itself, warrant a reversal of the judgment in this action. Just how far a trial court may go in instructions and an appellate court required to uphold the judgment under the provisions of section 4½ of article VI of the constitution cannot be so definitely limited or stated in language as to make a rule promulgated for one case applicable to every other case. The case at bar differs somewhat from the ordinary run of actions, in that the instruction given apparently runs counter to a section of the state constitution, and just how far such an instruction may go without necessitating a reversal is not made clear by anything called to our attention by counsel in this case. In *People* v. *O'Bryan,* 165 Cal. 55 [130 Pac. 1042], the majority of the court, in considering a like question, used the following language: "But it does not follow that every invasion of even a constitutional right necessarily requires a reversal. It may well be that the court, after examining the entire cause, including the evidence, is of the opinion that the error complained of, whatever its character, has not resulted in a miscarriage of justice. The mere fact

that the assignment of error is based upon a provision of the Constitution is not conclusive." Again, in *Estate of Baird*, 173 Cal. 617 [160 Pac. 1078], a case where the court had substituted itself for the jury, we find the following: "But where the error is so grave as the unauthorized substitution of the court for the jury as the tribunal to hear the evidence and determine the facts, we cannot, as a general rule, say that the scheme in force in this state for the administration of justice has not miscarried." (Citing *People* v. *O'Bryan, supra.*) "Doubtless, there may be cases so devoid of merit or so wanting in proof of some essential fact that the judgment of the lower court to that effect should be upheld, even in the face of such an error." Other cases might be cited where similar views are expressed, a summary of which may be stated in the following words: The mere fact that error is made to appear does not present a case for reversal, but it must appear affirmatively, after an examination of the entire cause, including the evidence, from the nature of the error itself, that there has been a miscarriage of justice. (See cases cited in *People* v. *Attema*, 75 Cal. App. 642 [243 Pac. 461].) Again, the alleged error in this case does not go to the denial of a fundamental right, such as was presented for our consideration in the case of *People* v. *O'Connor*, 81 Cal. App. 506 [254 Pac. 630], and in the cases there cited. While the court did instruct the jury as to a question of fact, it did not take away from the jury the right to pass judgment upon all the facts involved. So far as the driver of the appellant's bus was concerned, any jury possessing ordinary common understanding would know that the bus driver was vitally interested in the result of the action, because it was upon his alleged negligence that his employer was being sued for damages, and the jury would know that the defendant could not be held liable without first holding that the bus driver was guilty of negligence, which made him such an apparent interested party that the statement of such fact by the court added nothing whatever to the knowledge already possessed by the jury. Practically the same may be said of the defendant's driver who was accompanying the defendant's driver of the bus involved in this collision. He and the driver who was actually driving the bus had taken the vehicle to a public scales in order

to have it weighed, and were returning therewith to a garage maintained by the defendant. The only difference in the situation between the two drivers consisted in this: That one certainly might have been made liable for damages in the event that his employer was legally liable. The other, possibly, might not have been so held, but his position put him in the same class of an interested witness in behalf of his employer, and the jury, without the instruction of the court, would doubtless have so classified him. Again, an examination of the testimony of the defendant's driver who was accompanying the driver of the bus will show that if the jury absolutely disregarded his testimony, it did not tend in any way to a miscarriage of justice. As the testimony of this witness appears in the transcript, it shows upon its face that it is incredible. This witness testified that he was sitting on the left-hand side of the bus that the witness Archer was driving. "The driver sat to my right and in front of me. The stage was running about 20 miles an hour, and was being driven about 7 feet from the right-hand curb of Mill street, as it was going south. I first noticed the Ford coupe when the stage was possibly 6 feet past the curb line of the intersection. At that time the stage was moving about 15 miles an hour. When I first saw the Ford coupe it was about 20 feet east of the east curb line of Mill street, and was traveling about 25 miles an hour. At about the center of the intersection the stage turned a little to the right. At that time the Ford was about 30 feet east to our left. The Ford coupe straddled the manhole in the center of the intersection. The Ford then turned to the south. The machines did not come together. When the Ford turned to the south, the left wheels left the pavement, and the Ford tipped over onto the bus. At that time the Ford was traveling about 15 miles an hour. After the cars came together the stage traveled about 10 feet." The measurements of the intersection involved in this action show that its dimensions are forty by forty feet, that being the width of both streets involved between the curb lines. The testimony in the case shows that the collision occurred about ten feet west of the center of the intersection. According to the testimony of the witness, whose statements are here being analyzed, the Ford straddled the manhole

in the center of the intersection (other witnesses described this center as being marked by a button), and that the collision occurred after the Ford had passed the center of the intersection. Thus, the Ford, if it was twenty feet east of the east line of Mill Street, had to travel at least fifty feet before reaching the point of the collision, while the bus, if at the time the Ford was twenty feet east of the east line of Mill Street was six feet south of the north line of Industrial Street, had to travel only about twelve feet to reach the point of the collision. Industrial Street was only twenty feet from the curb line to the center line. Excluding the six feet that the bus was projecting south of the north line of Industrial Street leaves only fourteen feet, and if the Ford coupe straddled the manhole at the center of the intersection, at least two feet of the machine would be north of the center line, which would reduce the traveling distance of the bus another two feet, leaving only twelve feet for the bus to travel, while the Ford was traveling fifty feet. Thus, if the bus was traveling, as stated by the witness, about fifteen miles per hour, the Ford coupe, having a trifle over four times the distance to cover in order that a collision might take place, must have been traveling from sixty to sixty-five miles an hour. In the face of such incredible testimony when applied to the facts, it cannot very well be perceived how any error of the court in instructing the jury that the witness was interested could result in a miscarriage of justice. Again, this witness testified that the stage stopped in about ten feet after the collision. The physical facts as disclosed by the testimony of all the other witnesses shows that the Ford coupe was carried by the bus, or pushed by the bus, to a point about ten feet south of the south line of Industrial Street. The only support of the testimony of this witness presented to us is the untenable argument of appellant that liability is lacking because the sharp turning of the Ford to the left to prevent a head-on collision caused the Ford to topple over to the right, and it was then that the collision occurred.

It may be further stated that if the instruction set forth herein tended to discredit defendant's witnesses, it had the same effect upon the witnesses for the plaintiff. None but relatives testified in her behalf. The relatives and the

two drivers were the only witnesses as to who had the right of way.

Being satisfied from the whole record that no error was committed in allowing the jury to view the wrecked Ford, and that the alleged error of the trial court in giving the instruction set out in this opinion did not result in a miscarriage of justice, and could not have had any influence upon a jury whatever, the judgment is affirmed.

Finch, P. J., and Hart, J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on February 16, 1928.

All the Justices concurred.