[Crim. No. 6832. Third Dist. Aug. 30, 1973.]

In re MARCUS R. CASTANEDA on Habeas Corpus.

826

## Counsel

David M. Weetman, under appointment by the Court of Appeal, for Petitioner.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, Doris H. Maier, Assistant Attorney General, James T. McNally and Anthony L. Dicce, Deputy Attorneys General, for Respondent.

## OPINION

**JANES, J.**—Petitioner is confined at Folsom state prison following re-imprisonment on a charged parole violation. He seeks a writ of habeas corpus, contending that the Adult Authority has denied him the preliminary hearing required by *Morrissey* v. *Brewer* (1972) 408 U.S. 471 [33 L.Ed.2d 484, 92 S.Ct. 2593].

### THE MORRISSEY CASE

In *Morrissey* the court held that, under the due process clause of the Fourteenth Amendment, a parolee is entitled to two separate hearings during "the typical process of parole revocation." The first hearing is "in the nature of a 'preliminary hearing' " conducted "at or reasonably near the place of the alleged parole violation or arrest and as promptly as convenient after arrest while information is fresh and sources are available." The ultimate function of the hearing officer at that initial stage is "to determine whether there is probable cause or reasonable ground to believe that the arrested parolee has committed acts that would constitute a violation of parole conditions." Determination of that issue adverse to the parolee warrants his continued detention and return to the state correctional institution pending the final decision of the parole board on revocation. The preliminary hearing officer can be "someone such as a parole officer other than the one who has made the report of parole violations or has recommended revocation." (408 U.S. at pp. 484-487 [33 L.Ed.2d at pp. 496-498].)

*Morrissey* further requires that within a reasonable time after the parolee is taken into custody, and prior to a final decision by the parole authority, a second hearing must be held "if it is desired by the parolee . . . ." The latter hearing—the revocation hearing itself—must be before "a 'neutral and detached' hearing body such as a traditional parole board . . . ." The second hearing "must be the basis for more than determining probable cause; it must lead to a final evaluation of any contested relevant facts [e.g., whether parole conditions were violated] and consideration of whether the facts as determined warrant revocation [e.g., whether there are mitigating circumstances]." (408 U.S. at pp. 487-489 [33 L.Ed.2d at pp. 498-499].)

*Morrissey* also specifies certain procedural rights which must be allowed the parolee in connection with each hearing. Common to both hearings are his right to advance notice of the claimed violations of parole, and his entitlement to be heard in person and to present witnesses and documentary evidence. At the *Morrissey* preliminary hearing, "[o]n request of the parolee, persons who have given adverse information on which parole revocation is to be based are to be made available for questioning in his presence. However, if the hearing officer determines that the informant would be subjected to risk of harm if his identity were disclosed, he need not be subjected to confrontation and cross-examination." At the later revocation hearing, the parolee has a similar "right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation) . . . ." (408 U.S. at pp. 486-489 [33 L.Ed.2d at pp. 497-499].)

The *Morrissey* decision was filed June 29, 1972. It declares that its procedural demands "are applicable to future revocations of parole . . . ." (408 U.S. at p. 490 [33 L.Ed.2d at p. 499].)

FACTS

The controlling facts before us are essentially undisputed.

Petitioner is currently serving a five-year to life sentence imposed on him by the Superior Court of Orange County for violation of Penal Code section 211. He was released on parole on December 23, 1971. On June 16, 1972, in the company of Edward Ditzer (also a parolee), petitioner was arrested in Richmond, California, for car theft. Following a search of the vehicle, petitioner was then arrested for possession of a sawed-off shotgun.

On July 7, 1972, a parole violation charge was filed against petitioner. The charge specified that "Marcus Castaneda violated Condition 3[1] of the Conditions of Parole by having under his control a sawed-off shotgun."

In support of the charge against petitioner, the Parole and Community Services Division furnished the Adult Authority with the following evidentiary summary: ". . . On 6-16-72 Subject was stopped in North Richmond . . . in a blue 1967 stolen Firebird driven by Edward Ditzer who is on parole to Parole Agent McCarthy. At the time of detention Castaneda

---

[1]As shown by CDC Form No. 1515 filed herein, Condition 3 of petitioner's parole reads as follows: "3. WEAPONS: I will not own, possess, use, sell, or have under my control any firearms or other deadly weapons as defined in Section 3024 of the Penal Code."

was seated in the front right seat of said vehicle. When a check was made on the vehicle in question both suspects were arrested and charged with auto theft.

"A search was made of said vehicle and several shotgun shells were found beneath the front seat, driver's side, as well as underneath the rear seat. A sawed-off shotgun wrapped in a green shirt, fully loaded, was also found broken down and hidden within the springs of the rear seat as well as several other shells.

"When Ditzer was questioned by Detective Duncan of the Richmond P.D. . . . . Ditzer stated that his companion Castaneda had nothing to do with the theft of the car, stolen license plates, possession of the shotgun or any of the pills found in the car. Ditzer stated that . . . he visited the Cortese Used Car lot and took a 1967 Firebird for a test drive and kept same. Ditzer stated that at the time he took the Firebird he was alone. When questioned concerning the shotgun, Ditzer stated that he bought the shotgun from a gun shop in Hayward and that he paid $80.00 for it. Ditzer also stated that he was the person who sawed the shotgun barrel down and that no one else was involved in the incident. Concerning the stolen license plates, Ditzer stated that on the date that he took the Firebird he went to Pinole Auto Wreckers and got the plates from there. The Richmond Police Department was unable to find any evidence as to any guilt on the part of [Castaneda] and as a result, all charges against him were dropped."

On July 14, 1972, petitioner's parole was suspended by the Adult Authority and an order was issued for his return to prison for revocation proceedings. Prior thereto, he had been transferred to the Contra Costa County jail at Martinez (apparently from the Richmond branch jail) to await parole disposition. On July 19, parole officers arrived at Martinez and transferred petitioner to San Quentin to await his further transportation to the California Conservation Center at Susanville. Petitioner arrived at Susanville on August 10, 1972.

Not until August 17, 1972, was petitioner served with a notice of the charge against him (notice of complaint—CDC Form 263). By that notice he was advised that he was charged with violation of Condition No. 3 of his parole. It may be inferred from his petition that he was also at that time furnished a copy of the July 7 violation report containing the summary of evidence in support of the charge (and set out at length above). The notice further advised him that a hearing on the charge and supporting evidence would be held at an institution "to be determined" on a date "to be determined."

On September 20, petitioner was furnished a notice of right to revocation hearing reciting that "there is probable cause to believe that you have violated the conditions of your parole." The notice further recited that petitioner's case "would soon be heard," and advised him of his rights to appear personally before a panel of the Adult Authority, to present witnesses and produce documentary evidence, and to question persons who had given adverse information concerning him. The notice did not, however, list the names of any persons who had given adverse information against petitioner.

On September 29, 1972, petitioner was transferred to Folsom state prison.

Petitioner's revocation hearing was held at Folsom on October 10, 1972. He pled not guilty to the charge of possession of a sawed-off shotgun but was found guilty of the charge and his parole was .revoked. The written observations of the prison staff representative made at that time indicate that petitioner "stood on the record" and did "not wish to make any statement in his defense." It was further noted that petitioner had been given a copy of his parole violation charge and "supporting evidence"—presumably that contained in the July 7 violation report—on August 19, 1972; that on September 20, 1972, he had been advised of his right to a revocation hearing; and that the Richmond police report was to be "thoroughly reviewed and underlined" for use at the revocation hearing.

In the permanent addenda incorporated in the report of petitioner's revocation hearing appear the following comments by the Adult Authority panel and staff: "[P]etitioner contests violation since Edward Martinez Ditzer assumes blame. Statement should be available at time of hearing in which Ditzer signs to assume blame. Arrest reports should be underscored to point up other ties that point to [petitioner's] guilt. . . . Facts of arrest report implicate [petitioner] beyond claimed involvement. Seemed to be preparing for robbery."

Petitioner alleges without contradiction that he first inquired about a "preliminary hearing" on August 19, 1972, after his arrival at Susanville, but was given. a "negative answer;" that after his arrival at Folsom he inquired whether he would receive "an entitled parole revocation hearing" and was told "no." There is no showing in the return filed by the Attorney General that petitioner was. ever given notice of his right to a "preliminary" or pre-revocation hearing.

### DISCUSSION OF CONTENTIONS

Petitioner raises various contentions of irregularity in the October 1972 revocation hearing; his principal complaint, however, is that he was not afforded a preliminary hearing at a time, place and in the manner prescribed by *Morrissey*. We have concluded that he was wrongfully denied a preliminary (i.e., pre-revocation) hearing, and that if, upon such hearing, probable cause is found to believe that he has committed an act or acts which would constitute a violation of the relevant parole condition a new revocation hearing will be required. We confine our discussion, therefore, to a discussion of petitioner's right to a preliminary hearing.

*Morrissey* was decided June 29, 1972—15 days prior to the suspension of petitioner's parole. The Attorney General's first answer to petitioner's claim of right to a preliminary hearing is the suggestion that *Morrissey*, under United States Supreme Court rule 59, did not become final until July 24, 1972,[2] 10 days after petitioner's parole was suspended. Accepting, for the purpose of argument, the premise that the date of *suspension* is the critical date for determining application of the *Morrissey* principles, we point out that the question of *Morrissey's* finality is no longer in doubt. *Morrissey* declares that its procedural demands "are applicable to future revocations of parole . . . ." (408 U.S. at p. 490 [33 L.Ed.2d at p. 499]) and we are bound by the authorities determining June 29, 1972 (the date of decision) as the operative date of the decision. (See, *People* v. *Vickers* (1972) 8 Cal.3d 451, 462 [105 Cal.Rptr. 305, 503 P.2d 1313]; see also, *In re Prewitt* (1972) 8 Cal.3d 470, 476-477 [105 Cal.Rptr. 318, 503 P.2d 1326]; *People* v. *Nelson* (1972) 8 Cal.3d 463, 465 [105 Cal. Rptr. 314, 503 P.2d 1322].) Petitioner's due process rights are therefore governed by the *Morrissey* principles we have summarized above.

The Attorney General next finds an implication in the *Morrissey* opinion that the states were to be allowed a reasonable time within which to implement the new procedures required by that decision.[3] We do not so interpret the footnoted excerpt relied upon by the Attorney General. A stronger implication is that the procedures enunciated were intended to be applicable to *all* revocations of parole after the effective date of the deci-

---

[2] Under rule 59, mandates may not issue until 25 days after the day judgment is entered. This period corresponds to the period within which a petition for rehearing may be filed under rule 58.

[3] "We have no thought to create an inflexible structure for parole revocation procedures. The few basic requirements set out above, *which are applicable to future revocations of parole,* should not impose a great burden on any State's parole system." (*Morrissey, supra,* 408 U.S. at p. 490 [33 L.Ed.2d at p. 499].) (Italics added.)

sion. If a date for compliance different from the date of decision had been intended by the Supreme Court it would have been a simple matter for the court so to express itself. In any event, the Attorney General's brief points out that the California Adult Authority had geared up to implement the *Morrissey* decision during the last week in July, approximately 30 days after the date of the *Morrissey* decision and approximately 2 weeks after suspension of petitioner's parole, yet it was not until August 17 that petitioner was served with notice of the charge against him and his revocation hearing was not held until October 10, 1972.

*Morrissey* states in part: "Society has a stake in whatever may be the chance of restoring [the parolee] to normal and useful life within the law. Society thus has an interest in not having parole revoked because of erroneous information or because of an erroneous evaluation of the need to revoke parole, given the breach of parole conditions. . . . And society has a further interest in treating the parolee with basic fairness: fair treatment in parole revocations will enhance the chance of rehabilitation by avoiding reactions to arbitrariness." (33 L.Ed.2d at p. 496.) We believe such fundamental due process considerations are of sufficient importance to the parolee to justify, on balance, the unsubstantial burden which would be placed on the state to provide petitioner with the preliminary hearing required by *Morrissey*. (See, *Goldberg* v. *Kelly* (1970) 397 U.S. 254, 265-266 [25 L.Ed.2d 287, 297-298, 90 S.Ct. 1011].)

▮ The Attorney General's final response to petitioner's contention is that affording petitioner a preliminary hearing at this point in time would be a futile act. The argument is that petitioner *received* a "Morrissey-type *revocation* (italics added) hearing" and that "[s]ince at the *Morrissey*-type revocation hearing the Adult Authority decided that the facts warranted revocation of petitioner's parole, the question of probable cause of the parole violation is now moot and to hold such a pre-revocation hearing at this point would be a futile gesture."

*Morrissey's* requirement of a preliminary hearing would be meaningless, however, if the state could cure the denial of a preliminary hearing by the mere holding of a revocation hearing. The *Morrissey* case requires *both* hearings during the typical process of parole revocation. ▮ The omission of a preliminary hearing on charges of parole violation is analogous to the absence of a preliminary examination on criminal charges prosecuted thereafter by information. If the latter examination has not been waived, prejudice is presumed from the lack of one, and the defect is jurisdictional. (*People* v. *Elliot* (1960) 54 Cal.2d 498, 503-507 [6 Cal.Rptr. 753, 354 P.2d 225]; *People* v. *Brooks* (1946) 72 Cal.App.2d 657, 661 [165 P.2d

51].) As said in a related context: "When we speak of administering 'justice' in criminal cases, under the English or American system of procedure, we mean something more than merely ascertaining whether an accused is or is not guilty. It is an essential part of justice that the question of guilt or innocence shall be determined by an orderly legal procedure, in which the substantial rights belonging to defendants shall be respected." (*People* v. *O'Bryan* (1913) 165 Cal. 55, 65 [130 P. 1042]; to the same effect, see *People* v. *Elliot, supra,* at pp. 506-507.) "Error that results in the deprivation of a basic right necessarily requires reversal to preclude prejudice to the judicial process and to the procedural rights of a litigant even though there might be equally fair alternatives consonant with due process." (*People* v. *Gaines* (1962) 58 Cal.2d 630, 642 [25 Cal.Rptr. 448, 375 P.2d 296] (dissenting opinion by Traynor, J.); cf., *People* v. *Billon* (1968) 266 Cal.App.2d 537, 540-541 [72 Cal.Rptr. 198].)

We have indicated at the outset our conclusion that if, upon a preliminary hearing, probable cause is found to believe that petitioner has violated his parole, a new revocation hearing will be required. The minimum requirements of due process at the latter hearing include "(a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole." (*Morrissey, supra,* 408 U.S. at p. 489 [33 L.Ed.2d at p. 499].)

### DISPOSITION

Let the writ issue. It is ordered that the Adult Authority conduct further hearings in petitioner's case in conformance with the guidelines established in *Morrissey* v. *Brewer, supra,* 408 U.S. 471, and the views expressed herein, the preliminary hearing to commence within 30 days after this decision becomes final.

Friedman, Acting P. J., and Regan, J., concurred.

Petitioner's application for a hearing by the Supreme Court was denied October 24, 1973.